# 𝔘nited 𝔖tates 𝔆ourt 𝔒f 𝔄ppeals

## *for the*

# 𝔗hird 𝔆ircuit

Case No. 24-2761

CHRISTOPHER MASSEY,

*Appellant,*

v.

BOROUGH OF BERGENFIELD, et al.,

*Appellees.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY
DOCKET NO. 2:20-CV-01942, HONORABLE JAMEL K. SEMPER

## APPELLANT'S BRIEF AND
## JOINT APPENDIX VOLUME I of III

DYLAN T. HASTINGS, ESQUIRE
WILLIAMS CEDAR LLC
*Attorneys for Appellant*
One South Broad Street
Suite 1510
Philadelphia, PA 19107
215-557-0099

# TABLE OF CONTENTS

STATEMENT OF SUBJECT MATTER
& APPELLATE JURISDICTION ........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...............1

STATEMENT OF RELATED CASES AND PROCEEDINGS..........2

CONCISE STATEMENT OF THE CASE ........................................2

I.    RELEVANT FACTS.................................................................2

     a. The Borough of Bergenfield ............................................2

     b. Appellant's Background ...................................................4

     c. Appellees' Backgrounds ...................................................4

     d. Operation of the BFPD ....................................................6

     e. Appellant Interviews for Chief in 2015 ..........................7

     f. Rabboh Becomes a Candidate for Chief ..........................12

     g. Rabboh's Criminal and
       Disciplinary History in the BFPD ...................................15

     h. Appellant and Rabboh Interview
       for the Promotion to Chief ...............................................16

     i. 2019 Interviews for Chief...............................................17

        i. Appellee Amatorio's Reasoning .............................19

        ii. Appellee Rivera's Reasoning..................................21

iii.  Appellee Deauna's Reasoning ................................. 23

iv.  Appellee Marte's Reasoning .................................. 24

j.  The Remaining Interview Attendees Fail
to Make Sense of Appellees' Decision
to Promote Rabboh over Appellant ................................. 26

k.  Rabboh is Sworn in as Bergen County's
First Muslim Chief of Police ........................................... 27

PROCEDURAL HISTORY ................................................................ 30

RULINGS PRESENTED FOR REVIEW ........................................... 31

SUMMARY OF THE ARGUMENT .................................................. 32

ARGUMENT ...................................................................................... 34

I.     STANDARD OF REVIEW ................................................ 34

II.    APPELLANT PROVED HIS *PRIMA FACIE*
CASE OF REVERSE RACIAL DISCRIMINATION
UNDER THE NEW JERSEY LAW
AGAINST DISCRIMINATION ......................................... 35

a.  Appellant is more qualified than Rabboh .................... 38

b.  The background circumstances surrounding
Appellees' decision to promote Rabboh over
Appellant are "fishy" .................................................... 40

III.   THE "LEGITIMATE, NON-DISCRIMINATORY"
REASONS OFFERED BY APPELLEES ARE
PRETEXT FOR RACIAL DISCRIMINATION ................. 42

IV.    APPELLANT'S §1983 REVERSE RACIAL
DISCRIMINATION CLAIM UNDER THE
FOURTEENTH AMENDMENT'S
EQUAL PROTECTION CLAUSE
WAS PROPERLY PLEADED ............................................47

V.    AN IMPLIED CAUSE OF ACTION
UNDER 42 U.S.C. § 1981 EXISTS
AGAINST THE BOROUGH OF BERGENFIELD ............51

CONCLUSION ........................................................................52

COMBINED CERTIFICATIONS.....................................53-55

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*A.D.P. v. ExxonMobil Rsch. and Eng'g Co.,*
428 *N.J. Super.* 518 (App. Div. 2012) ......................................35

*Bergen Com. Bank v. Sisler,*
157 *N.J.* 188 (1999) ...............................................................36, 37

*Bradley v. Pittsburgh Bd. of Educ.,*
913 F.2d 1064 (3d. Cir. 1990)..............................................48, 49

*Brown v. Hartshorne Pub. Sch. Dist. No. 1,*
864 F.2d 680 (10th Cir. 1988). ...................................................49

*Cappella v. City of Atl. City,*
2014 WL1281516 (App. Div. 2014) .........................................37, 41

*DeCapua v. Bell Atl.-N.J., Inc.,*
313 *N.J. Super.* 110 (Law Div. 1998)......................................37

*Erickson v. Marsh & McLennan Co.,*
117 *N.J.* 539 (1990) ...............................................................36

*Gerety v. Atl. City Hilton Casino Resort,*
184 *N.J.* 391 (2005) ...............................................................35

*Grano v. Dep. of Dev.,*
637 F.2d 1073 (6th Cir. 1980) ...................................................49

*Hill v. Algor,*
85 F.Supp.2d 391 (D.N.J. 2000)................................................37

*Hopp v. City of Pittsburgh,*
194 F.3d 434 (3d Cir. 1999).....................................................36, 50

*Iadimarco v. Runyon,*
190 F.3d 151 (3d Cir. 1999) .......................................................50

*Jett v. Dallas Indep. Sch. Dist.,*
491 U.S. 701 (1989) ...................................................................50

*Johnston v. Harris Cnty. Flood Control Dist.,*
869 F.2d 1565 (5th Cir. 1989) ...................................................49

*Keller v. Prince George's Cnty.,*
827 F.2d 952 (4th Cir. 1987) .....................................................49

*Knoll v. Springfield Twsp. Sch. Dist.,*
699 F.2d 137 (3d Cir. 1983) .......................................................50

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792 (1973) ............................................. 35, 36, 42, 50

*McGovern v. City of Philadelphia,*
554 F.3d 114 (3d Cir. 2004) .......................................................50

*Miller v. N.J.,*
144 Fed.Appx. 926 (3d Cir. 2005) .............................................37

*Murray v. Newark Hous. Auth.,*
311 *N.J. Super.* 163 (Law Div. 1998) .......................................46

*Norfolk S. Ry. v. Basell USA Inc.,*
512 F.3d 86 (3d Cir. 2008) .........................................................34

*Price Waterhouse v. Hopkins,*
490 U.S. 228 (1989) ...................................................................35

*Reitz v. Cnty. of Bucks,*
125 F.3d 139 (3d Cir. 1997) .......................................................34

*Roberts v. Coll. of the Desert,*
870 F.2d 1411 (9th Cir. 1988) .................................................49

*Robinson v. PPG Indus. Inc.,*
23 F.3d 1159 (7th Cir. 1994) ...................................................34

*Stewart v. Rutgers,*
120 F.3d 426 (3d Cir. 1997) .....................................................34

*Trigg v. Fort Wayne Cmty. Sch.,*
766 F.2d 299 (7th Cir. 1985) ...................................................49

*Williams v. Casino Reinvestment Dev. Auth.,*
2021 WL 2934703 (App. Div. 2021) .........................................36

*Williams v. Pa. Hum. Rel. Comm'n,*
870 F.3d 294 (3d Cir. 2017) .....................................................47

## Statutes and Other Authorities:

42 U.S.C. § 1981 .....................................................................*passim*

42 U.S.C. § 1983 .....................................................................*passim*

28 U.S.C. § 1331 .............................................................................1

28 U.S.C. § 1367 .............................................................................1

Title VII ...................................................................................*passim*

Fed. R. Civ. P. 4(a)(1)(A) ...............................................................1

Fed. R. Civ. P. 56(c) ......................................................................35

L.A.R. 28.1(a)(1) .............................................................................1

L.R. 56.1 (a) ...............................................................39

*N.J.S.A.* 10:5-12, *et seq*...........................................*passim*

## STATEMENT OF SUBJECT MATTER & APPELLATE JURISDICTION

This is an appeal wherein the United States District Court for the District of New Jersey had original jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367. This in an appeal from a final judgment of the United States District Court, entered on September 11, 2024. A Notice of Appeal was timely filed on September 19, 2024. Accordingly, this Court has jurisdiction under Fed. R. Civ. P. 4(a)(1)(A).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Appellant is unable to comply with L.A.R. 28.1(a)(1) as there were no hearings affording Appellant the right to object and present his issues before the dismissal of his case.

1. Whether the District Court erred in failing to appreciate Appellant's superior qualifications as compared to Mustafa Rabboh's and Appellees' obvious agenda to promote a minority by holding that Appellant failed to prove his *prima facie* case of reverse racial discrimination under the New Jersey Law Against Discrimination?

2.    Whether the District Court erred by concluding that Appellees' "legitimate, non-discriminatory" reasons for promoting Mustafa Rabboh over Appellant were legitimate?

3.    Whether the District Court erred as a matter of law in holding that a reverse racial discrimination claim is not an available remedy under the Fourteenth Amendment's Equal Protection Clause?

4.    Whether the District Court erred as a matter of law in holding that an implied cause of action does not exist under 42 U.S.C. § 1981 against the Borough of Bergenfield?

## STATEMENT OF RELATED CASES AND PROCEEDINGS

There are no related cases or proceedings.

## CONCISE STATEMENT OF THE CASE

### I.  RELEVANT FACTS

#### a.  The Borough of Bergenfield.

The Borough of Bergenfield is a municipality located in Bergen County, NJ that operates under borough form of municipal governance (the "Borough"). The Borough's governing body is comprised of a mayor

and a 6-member council which are all elected partisan positions.[1] *See* https://bergenfield.com/mayor-and-council. The Borough has long held the reputation as one of the safest towns in the entire Country ranking as high as 2nd in a recent national ranking. JA588 at 28:28-29:2, JA589 at 30:12-18, JA539 at 38:19-39:10, JA496 at 47:6-48:11. The Borough is also one of the most ethnically diverse municipalities in the State. JA513, JA329-30.

The Borough's police department ("BFPD") consists of approximately 46 police officers. JA866. The Borough's residents have always enjoyed a positive relationship with the BFPD and its officers given their regular involvement in the community. JA588 at 29:3-19, JA589 at 31:14-25. In fact, crime has never been an issue in the Borough. JA647 at 199:23-200:25, JA557 at 19:3-13, JA539 at 40:19-41:1. Promotions within the BFPD are made by a majority vote of the Council with the Mayor serving as a tie-breaking vote. JA603 at 22:12-20.

---

[1] At all material times, Norman Schmeltz served as the Borough's mayor, Thomas Lodato, Ora Kornbluth, Arvin Amatorio, Hernando Rivera, Buddy Deauna, and Rafael Marte served as councilmembers, and Corey Gallo served as business administrator.

**b. Appellant's Background.**

Christopher Massey ("Appellant") began working as a BFPD officer in January 1995 after graduating from the Bergen County Police Academy in May 1995. JA443-44 at 13:19-14:8, JA848. Before attending the Police Academy, Appellant graduated from Bergenfield High School in 1987 and Montclair State University in 1992 with a bachelor's degree in finance and marketing. JA443-44 at 11:5-12:16, JA848. Appellant was promoted to Sergeant in 2003, Lieutenant in 2007, Captain in 2012, and Deputy Chief in 2016. JA848. Appellant's family members are also employees of the Borough as his wife is a guidance counselor and his brother is the athletic director at Bergenfield High School. JA470-71 at 121:23-122:8. Appellant is a Caucasian.

**c. Appellees' Backgrounds.**

Arvin Amatorio ("Appellee Amatorio") is a Filipino immigrant who owns his own immigration law practice and was elected to the Council in 2014. JA489-90 at 9:9-10-17, JA525 at 151:5-16. Appellee Amatorio was elected the Borough's Mayor in 2019 and currently serves in that position. JA509-11 at 87:16-95:7. At all material times, Appellee

Amatorio served as a member of the Council and was a member of the Council's police committee. JA539 at 15:4-23.

Hernando Rivera ("Appellee Rivera") is a Columbian immigrant who works at Fairleigh Dickenson University as an associate director of the "Latino Program" where he helps Latino students apply for financial aid. JA562-63 at 8:8-9:17, JA563 at 10:17-21. At all material times, Appellee Rivera served as a member of the Council and was a member of the Council's police committee. JA558 at 89:1-24.

Buddy Deauna ("Appellee Deauna") is a Filipino immigrant who owns a travel agency specializing in Asiatic trips and was elected to the Council in 2016. JA606-07 at 11:15-14:19. Appellee Deauna was asked by Appellee Amatorio to run for Council who also helped with his campaign. JA606-07 at 11:15-14:19, JA524 at 148:24-149:18. At all material times, Appellee Deauna served as a member of the Council.

Rafael Marte ("Appellee Marte") is a Dominican immigrant and retired social worker. JA584 at 15:8-16, JA585 at 17:8-18:24. Appellee Marte was elected to the Council in 2016 and campaigned with Appellee Amatorio on the same ticket. JA584 at 15:8-16, JA585 at 17:8-18:24,

JA524-25 at 149:19-150:10. At all material times, Appellee Marte served as a member of the Council.

Ora Kornbluth ("Appellee Kornbluth") is an executive director at Yeshivat He 'Atid in Teaneck, NJ and was elected to the Council in 2010. JA615-16 at 8:3-10:15. At all material times, Appellee Kornbluth served as a member of the Council and was a member of the Council's police committee. JA616 at 10:16-11:16.

### d. Operation of the BFPD.

In or around 2012, Appellant and Cathy Madalone ("Madalone"), then Lieutenants, were promoted to the only two vacant Captain positions. JA447 at 27:25-28:20, JA448 at 32:22-33:10, JA848. At or around the same time, Mustafa Rabboh ("Rabboh") was promoted from patrol Sergeant to patrol Lieutenant. JA742 at 19:7-12, JA854. Rabboh is a Muslim Palestinian immigrant who transferred to the BFPD from the Paterson Police Department in 2003. JA754 at 67:12-17, JA775 at 151:24-151:12, JA854. At this time, the BFPD was led by Chief Michael Carr ("Carr"). JA452 at 47:3-48:19. During Carr's tenure, Appellant served as his second in command and was regularly assigned as the BFPD's officer in charge ("OIC") during his absence. JA452 at 45:10-47:2,

6

JA254-275, JA881, JA848. As OIC, Appellant assumed Carr's duties and responsibilities, and was the *de facto* Chief of the BFPD. JA451 at 45:10-47:2, JA848.

### e. Appellant Interviews for Chief in 2015.

On July 30, 2015, Carr announced his retirement. JA448 at 33:1-10, JA262. Carr transferred command of the BFPD to Appellant "pending the decision of the Mayor and Council as to the position of Chief of Police." JA262. At this time, Appellant and Madalone were the only officers eligible to replace him. JA616 at 12:14-18. Appellant agreed that he and Madalone were equally qualified candidates for the promotion to Chief. JA452-53 at 49:16-50:7. Shortly after Carr's retirement, Appellant and Madalone were interviewed by the Council for promotion to Chief. JA616-17 at 12:13-13:3.

At that time, the Council included Appellees Kornbluth, Amatorio, and Rivera, Councilman Thomas Lodato ("Councilman Lodato"), and 2 others. JA616-17 at 12:13-13:3, JA492 at 20:25-21:22, JA542 at 28:2-23, JA633 at 5:23-6:12. At Madalone's interview, she presented the Council with a "Strategic 5-Year Plan" although this was not required. JA521 at 136:11-137:4, JA858. Appellant did not present a written plan. JA465 at

99:9-21. Notwithstanding, Appellee Amatorio voted for Appellant because he "believe[d] that he had the experience as captain and [] thought that . . . the department [would] be better." JA492 at 21:5-13. Appellee Amatorio voted for Appellant because he believed that Appellant was more qualified than Madalone for the promotion. JA492 at 21:23-22:2. Appellee Rivera, while he could not recall, voted for Appellant. JA542 at 26:19-27:21, JA562 at 5:16-6:3. Councilman Lodato and Appellee Kornbluth voted for Madalone. JA634 at 6:11-12, JA617 at 13:1-3. The vote between Appellant and Madalone was "very close." JA663-64 at 59:5-61:62:4. However, because of the Council's majority decision, Madalone was promoted to Chief. JA494 at 26:3-13.

Following Madalone's promotion to Chief, Rabboh was promoted to Captain of the traffic and records division to fill the vacancy left by Madalone. JA671 at 89:10-91:11, JA705 at 226:4-17, JA854. In this capacity, Rabboh was responsible for supervising approximately 4 officers to Appellant's 40. JA917 (emphasis added). Shortly after Madalone's promotion to Chief, she requested that the Council create a Deputy Chief position for Appellant because he was going above and beyond his duties as Captain. JA711-12 at 11:21-13:10, JA617 at 13:4-7,

JA619 at 22:21-23:2, JA620 at 26:18-27:18, JA634 at 7:3-8:12, JA548-50 at 52:6-57:6. The Council unanimously voted to create the Deputy Chief position for Appellant. JA450 at 41:11-24, JA548-50 at 52:6-59:20. The Council understood that Appellant's promotion to Deputy Chief created a defined succession plan for the rank of Chief upon Madalone's retirement especially considering how close the vote between Appellant and Madalone was. JA711-12 at 12:17-13:10, JA495 at 30:2-31:4, JA495 at 33:17-25, JA496 at 36:18-24, JA620 at 26:18-27:18.

As Deputy Chief, Appellant was responsible for supervising approximately 90 percent of the BFPD. JA451 at 42:6-23, JA848, JA917. Appellant continued serving as OIC under Madalone during her absences which were more frequent than Carr's. JA451-52 at 45:10-47:2, JA453 at 53:6-24, JA618-19 at 20:2-21:17, JA254-275. Also, while Madalone was Chief, Appellant estimates that they had countless conversations in preparation for him becoming the next Chief. JA450 at 38:18-39:16, JA451 at 42:6-23. Madalone also trained Appellant on a weekly basis in preparation for him becoming the next Chief. *Id.*

On February 13, 2019, Madalone went out on medical leave at which time she appointed Appellant as OIC until she was able to return, but she never did. JA881, JA451-52 at 45:23-47:2. During this period, the BFPD ran smoothly and effectively with Appellant as OIC, and the Council never voiced any criticism of Appellant's performance. JA634-35 at 9:25-10:24, JA635 at 13:11-18, JA641 at 34:8-35:4, JA608 at 18:18-19:2, JA502 at 59:18-60:6, JA734 at 101:19-102:8. In fact, Appellees *never* offered *any* criticism of Appellant with respect to his performance as Deputy Chief or OIC, either under Carr or Madalone. JA663 at 57:16-58:1.

In or around May 2019, Madalone informed the Council that she was retiring and issued a memo to the BFPD appointing Appellant as OIC until her retirement was finalized. JA551-52 at 45:23-47:2, JA273. Madalone recommended to the Council that Appellant be promoted to Chief and never suggested that Rabboh or any other officer be considered. JA631 at 30:21-31:1, JA638 at 25:14-19, JA675 at 107:18-21, JA552 at 68:6-12. Borough Administrator Corey Gallo ("BA Gallo") also recommended to the Council that Appellant be promoted given the strong working relationship that they developed over the years. JA627 at 55:9-

25, JA663-64 at 60:19-62:4, JA673-74 at 97:22-101:1, JA692 at 175:4-176:7.[2] At or around the same time, Madalone informed Appellant and Rabboh in a meeting that Appellant would be promoted to Chief following her retirement, but that the Council planned to dissolve the Deputy Chief position which meant that Rabboh would remain Captain. JA752-53 at 60:18-63:18. BA Gallo informed Rabboh the same. JA754 at 66:4-67:10, JA755 at 70:9-14. BA Gallo also informed officers in the BFPD that Appellant would be promoted to Chief. JA770 at 132:14-20, JA754 at 65:22-66:6, JA784 at 21:24-22:16. Appellee Kornbluth congratulated Appellant on becoming the next Chief and requested a meeting with him to discuss his future. JA456 at 63:17-64:13. Councilman Lodato and Appellee Amatorio also congratulated Appellant on becoming the next Chief. JA456-57 at 63:17-66:2.

However, the news that Appellant would be promoted to Chief was not surprising to anyone in the BFPD or the Borough given his rank and experience running nearly every department. JA794 at 13:9-14:7, JA635

---

[2] However, Appellee Amatorio did not see BA Gallo's working relationship with Appellant as a "part of the merit (sic) of the case" and did not consider it in evaluating Appellant and Rabboh during this promotional process. JA508 at 82:17-84:23 (Amatorio acknowledging that BA Gallo never represented that he had a strong working relationship with Rabboh).

at 12:19-13:18, JA620 at 26:18-27:18. Appellee Deauna even testified that he believed that Appellant would be promoted to Chief when Madalone announced her retirement. JA608 at 18:2-13. Madalone encouraged Appellant to apply for membership in the International, State, and Bergen County Police Chief Associations before her retirement became official and even served as his sponsor. JA456 at 62:21-63:13, JA898-903. Up until this point, Councilman Lodato could not recall Rabboh's name ever coming up in conversation as a potential candidate to replace Madalone. JA636 at 14:4-15:19, JA636 at 16:9-15. Rabboh even assumed that Appellant would be promoted to Chief. JA753 at 63:23-64:13.

### f. Rabboh Becomes a Candidate for Chief.

On or about June 3, 2019, BA Gallo requested that Appellant and Rabboh attend a June 6, 2019 police committee meeting with Appellees Kornbluth, Rivera, and Amatorio. JA458-59 at 73:2-75:14, JA879. During this meeting, BA Gallo informed Appellant and Rabboh that the Council intended to interview them both for promotion to Chief to their respective surprise. JA458-59 at 73:2-75:14, JA462 at 88:9-19. Interestingly, it was Appellee Rivera who suggested that Rabboh be considered for the

promotion, which stunned most of the Council given Rabboh's lack of qualifications and experience. JA712 at 14:20-15:25. However, Appellee Rivera "does not recall" suggesting that Rabboh be considered for the promotion to Chief. JA552 at 64:14-19, JA564 at 14:18-16:7.

During this meeting, Appellee Rivera confronted Appellant and demanded that he reveal the races and genders of 5 new BFPD officer candidates from the Civil Service list that Appellant was seeking approval to hire from. JA459 at 74:14-77:4, JA460 at 78:11-79:17. Curiously, Appellee Rivera "had spoken behind the scenes" that he wanted to hire Jessica Londono—a Hispanic female and his friend—who ranked lower on the Civil Service list. JA715-16 at 27:12-30:22, JA786 at 31:15-32:14. However, Appellant declined to provide Appellee Rivera with the information that he demanded and explained that it would violate the Civil Service rules which agitated Appellee Rivera who, in response, exclaimed that Appellant did "not even live in Bergenfield or look like the people of the town." JA459 at 74:14-77:4, JA460 at 78:11-79:17, JA460 at 80:2-16. Appellees Amatorio and Kornbluth, and Rabboh intervened to settle Appellee Rivera down and likewise informed him that his demands were improper. JA460 at 80:9-16. Appellee Rivera

testified that he did not "recall" attending this meeting or stating that Appellant "did not look like the people of Bergenfield." JA553-56 at 71:5-83:7. He also denied knowing Jessica Londono as anything more than a "citizen of Bergenfield" or that she was a BFPD police officer candidate. JA554 at 75:3-79:25. Interestingly, the other attendees cannot recall attending this meeting either. JA759-60 at 88:16-92:10, JA676-77 at 112:15-116:21, JA622 at 34:2-36:9, JA506-07 at 77:1-78:21. However, BA Gallo confirmed that it was against the Civil Service rules for Appellee Rivera to ask about the races and genders of the candidates on the list. JA677-78 at 116:18-117:4. Nevertheless, Appellee Rivera testified that he should "have the right" to demand this information because he is an "elected official." JA555 at 79:14-80:20. Appellee Rivera is also known for using the term "my people" in reference to Borough's Hispanic community. JA714-15 at 24:18 to 27:11, JA622 at 36:10-17, JA638-69 at 25:23-26:7.

Following this meeting, BA Gallo told Appellant not to worry about Appellee Rivera and that they were just interviewing Rabboh to avoid a lawsuit. JA462 at 89:4-16, JA465 at 98:25-99:16. Officers in the BFPD were surprised when they learned that Rabboh was being considered for

the promotion to Chief. JA794 at 15:21-16:5, JA806 at 31:7-32:18. Even Rabboh was surprised when he learned that he was being considered for the promotion as he anticipated that Appellant would be promoted. JA758 at 81:6-14. Interestingly, a few days later, while driving to a conference with Captain John Maggi and Lieutenant William Duran, Rabboh informed them that he was going to be the next Chief which caused Captain Maggi to "chuckle" and reply that he was going to be the next Chief in jest. JA784 at 24:4-19.

### g. Rabboh's Criminal and Disciplinary History in the BFPD.

Before becoming a police officer, Rabboh was arrested and charged in the late 1990s for unlawful possession of a firearm and hollow point bullets. JA741-42 at 15:1-17:14. At the BFPD, Rabboh has been the target of at least 7 Internal Affairs investigations and faced major discipline in 2014 as a Lieutenant for failing to maintain his Alcotest (aka breathalyzer) certification and send the officers for whom he was responsible for to training to maintain their certifications which affected the Bergen County Prosecutor's office ability to prosecute DWI arrests made by these officers. JA748-50 at 44:20-52:14. Some of Rabboh's Internal Affairs complaints were "demeanor" complaints from

community members stemming from his "demeanor" during his interactions with them. JA750-51 at 52:15-54:5. Appellant had never been the target of an Internal Affairs investigation or received discipline his entire career.

### h. Appellant and Rabboh Interview for the Promotion to Chief.

Appellees all testified that they did not discuss the candidates amongst themselves before the interviews with Appellee Deauna testifying that he did not even know who Rabboh was before he attended his interview. JA594 at 54:1-5, JA598-99 at 72:25-73:25, JA526-27 at 157:24-158:6, JA564-65 at 16:25-20:20, JA569-70 at 35:25-38:3, JA610-11 at 26:25-31:6. However, Appellee Kornbluth and Mayor Schmeltz believe that that Appellees Amatorio, Rivera, Marte, and Deauna conspired to vote for Rabboh before the interviews. JA630 at 65:12-66:5, JA713 at 20:13-5, JA716-17 at 31:22-33:22. During this time, Appellee Amatorio was actively campaigning against Mayor Schmeltz to become the Borough's next Mayor. JA509 at 87:16-89:7.

### i. 2019 Interviews for Chief.

On August 6, 2019, interviews for Chief were held in the Council's chambers. JA297. In attendance was Mayor Schmeltz, BA Gallo, Councilman Lodato, and Appellees. *Id.* Appellees testified that race should not be considered in the BFPD promotional process. JA621 at 32:17-20, JA658 at 40:4-12, JA643 at 42:23-43:4, JA527 at 159:13-17, JA556 at 82:4-10. Councilman Lodato and Mayor Schmeltz were the first to arrive to the Council's chambers the night of the interviews. JA637 at 21:10-21. Councilman Lodato sarcastically asked Mayor Schmeltz, "what are we doing here?" as he believed that it was a "forgone conclusion" that Appellant should be promoted to Chief. JA637 at 21:2-21. The Council entered closed session at 6:10 p.m. to conduct the interviews with Rabboh being interviewed first. JA297.

Appellee Marte was not present when the Council entered closed session for Rabboh's interview; he arrived at 6:41 p.m. which only allowed him to attend approximately 5-10 minutes of Rabboh's interview. JA712-13 at 16:20-17:18, JA764 at 106:4-11, JA297. Despite testimony and meeting minutes reflecting that he was 31 minutes late, Appellee Marte denied arriving late. JA587 at 27:7-24.

During Rabboh's interview, he presented the attendees with his resume and a "5-Year Strategic Plan" that mirrored Madalone's which many of the attendees recognized. JA712 at 17:19-18, JA624 at 42:2-44:23. Before the interviews, Madalone shared a copy of her "5-Year Strategic Plan" from 2015 with Appellant and Rabboh. JA758-59 at 84:20-88:14, JA464-65 at 97:3-98:21, JA826. Coincidentally, the metadata for Rabboh's plan proves that he did in fact copy Madalone's plan which he does not deny. JA762-63 at 99:3-101:10, JA857. Rabboh's interview lasted approximately 35-40 minutes during which Appellee Rivera and BA Gallo asked the majority of questions. JA763 at 103:13-24.

Thereafter, Appellant entered the Council's chambers for his interview before which he provided the attendees with his resume. JA848, JA465 at 100:1-6. During their respective interviews, both candidates committed to serving the BFPD for at least 5 more years. JA636 at 17:20-18:8, JA514 at 108:11-23. However, Appellant also represented that he would be open to working more than 5 additional years since his wife had several more years until she was eligible to retire. JA726-27 at 71:14-73:6. In fact, BA Gallo testified that Appellant

made it abundantly clear to the Council that he intended to work until his 30th year or more. JA697 at 195:22-196:7. The Council voted immediately following the conclusion of Appellant's interview. JA626 at 13:22.

Ultimately, Appellees Rivera, Amatorio, Deauna, and Marte, the 4 minority Council members accounting for the majority, voted to promote Rabboh over Appellant to the shock of the others present. JA626 at 52:5-19, JA714 at 21:12-22:21, JA724 at 63:25-64:21, JA641 at 36:17-37:1, JA694 at 182:3-13, JA297. After Appellee Marte placed the final vote for Rabboh, creating a majority decision, Councilman Lodato immediately slammed his fist on the table and exclaimed, "how are we going to justify this?!" JA641-42 at 36:17-38:16, JA730 at 87:8-20. Councilman Lodato, a seasoned attorney, testified that he believed the vote for Rabboh was "a wrong decision which was going to end up where we are today[]" referring to this lawsuit. JA641 at 36:17-37:7, JA633 at 4:15-21.

### i. Appellee Amatorio's Reasoning.

Appellee Amatorio testified that he determined that Rabboh was more qualified than Appellant based on his resume even though he admitted that Appellant was more experienced in both years and serving

in a supervisory role. JA503-04 at 65:7-66:19, JA506 at 76:2-16, JA521 at 137:14-17. Appellee Amatorio also found Rabboh's resume to be "impressive," and that Appellant's was "good," but could not recall what impressed him. JA520 at 131:4-132:25. However, Appellant's resume unequivocally demonstrates that he was more qualified than Rabboh and that Rabboh's resume is simply not comparable to Appellant's. JA848, JA854.

Appellee Amatorio also testified that one of the reasons that the Council "collectively" voted for Rabboh was because he could "render longer services to the Borough" because he had "more years" than Appellant until he could retire despite the fact that Appellee Amatorio did not know how long either candidate had been working for the BFPD or how many more years they needed to work until they could retire, and that both candidates committed to an additional 5 years of service. JA502-03 at 61:6-62:11, JA517-18 at 120:6-123:5. Further, as indicated above, Appellees all testified that they did not discuss the candidates or the interviews beforehand which would have made it impossible for them to "collectively" agree on whether Rabboh could "render longer services to the borough," or anything for that matter. JA594 at 54:1-5, JA598-99

at 72:25-73:25, JA526-27 at 157:24-158:6, JA564-65 at 16:25-20:20, JA569-70 at 35:25-38:3, JA610-11 at 26:25-31:6.

Another factor for Appellee Amatorio's vote for Rabboh was his "5-year plan" even though he acknowledged that he voted to promote Appellant in 2015 because he was more qualified than Madalone despite Madalone's "5-year plan" that Rabboh copied. JA492-93 at 20:25-26:13, JA522 at 138:3-140:25.

### ii. Appellee Rivera's Reasoning.

Appellee Rivera admitted that Appellant's experience was "superior" compared to Rabboh's, but one of the "major" reasons why he voted for Rabboh was because he would not be able to retire before Appellant despite not knowing how long each candidate had to work until they could retire and both candidates committing to an additional 5 years of service. JA569 at 35:25-36:17, JA570-71 at 38:9-41:16.

Another reason that Appellee Rivera voted for Rabboh was because he believed that "he [could] go out to reach more [in] the community" based on Rabboh's attendance at the BFPD Summer Youth Academy, church, a carnival, and Family Fun Day. JA576-77 at 63:6-67:24. This was apparently a concern of Appellee Rivera's given his entirely

unsubstantiated claims that there was a drug problem at the high school, that residents were afraid of the police, and that residents did not trust the police despite his admission that the Borough is one of the safest towns in the entire Country and that the BFPD has done an excellent job keeping the Borough safe. JA545-48 at 38:13-51:19, JA571-77 at 43:22-67:24. In fact, Appellee Kornbluth, Councilman Lodato, and Mayor Schmeltz confirmed that Appellee Rivera's claims were just that: lies. JA698-726 at 68:19-70:10, JA733 at 99:11-100:4, JA734 at 101:15-18. Even Rabboh testified that there were no known crime issues in the Borough at the time of the interviews. JA767 at 118:22-119:22. Notwithstanding, Appellant's resume clearly demonstrates that he is regularly active in the community as he serves as the BFPD's Board of Education liaison, Senior Resident Liaison, was responsible for school programs including Stranger Danger, Read Across America, and DARE, conducted vulnerability assessments for the Borough's schools, houses of worship, and businesses, and implemented and oversaw the Borough's Senior Resident Program which assists senior citizen groups with services and educational plans that help them remain independent. JA848.

### iii.  Appellee Deauna's Reasoning.

Appellee Deauna testified as follows regarding his vote:

> Q. But you still were able to vote for whoever was promoted, right?
> A. Basically an honest analogy and analysis, I have to come up with the decision which I think is good for the town. It is nothing personal.
>
> Q. Okay. Tell me why did you think Rabboh would be good for the town?
> A. I don't even know Mustafa Rabboh.
>
> Q. Did you say you don't know Mustafa Rabboh?
> A. No, I heard his name during the actual presentation of the applicants. I don't need to know the guy, you know, but if I can continue.
>
> Q. Okay.
> A. When I saw his application for the chief position, I was actually impressed.
>
> Q. What about his application were you impressed with?
> A. The chronology of his academic background, where he came from, and - -
>
> Q. What do you mean where he came from?
> A. Well, he came from Patterson.
>
> Q. Okay.
> A. That's where it is, as a patrolman. And just based on my analysis on the way it was presented to me and to the council, we never have any prior knowledge about this chief, you know.
>
> Q. So you had no idea who [Rabboh] was before you interviewed him?
> A. No, sir.

JA609 at 22:8-23:11 (emphasis added).

Unbelievably, Appellee Deauna testified that he did not recall receiving or reading Appellant's resume and did not even know which candidate had more experience. JA610-11 at 26:25-31:6 (emphasis added). Ultimately, Appellee Deauna believed that Rabboh would be better for the Borough because "he's more energetic, and . . . **he's a**

23

**minority."** JA611 at 31:16-32:10 (emphasis added), JA642 at 41:14-24, JA 643 at 43:10-22 (Lodato testifying that Appellee Deauna shared with him that there was an "incident" during his deposition referring to this testimony.)

### iv. Appellee Marte's Reasoning.

Similarly shocking, Appellee Marte, despite arriving 31 minutes late to Rabboh's interview and only attending the interview for no more than 5-10 minutes, testified that he voted for Rabboh "as a result of [the] interview[,]" his resume, and plans for the community without being able to elaborate in any detail. JA587 at 28:13-24, JA595 at 58:6-59:1, JA597 at 65:21-66:5. Oddly enough, Appellee Marte also commented on the quality of Rabboh's interview after he voted stating, "[Appellant] did a great job answering all the questions, he was incredible, but I think that Captain Rabboh answered the questions better, and, for that reason, I'm voting for Captain Rabboh." JA714 at 22:7-21.

Appellee Marte also testified that he did not personally know Rabboh before the interview, but that his resume reflected that his "community interaction was much greater [than Appellant's] and caught my attention[] [a]nd I believe that he was better in this community . . ."

24

JA589 at 34:1-35:18, JA591 at 44:3-15. However, Appellee Marte must have confused Rabboh's resume for Appellant's as Rabboh's resume is silent on his "community interaction" while Appellant's clearly highlights his community involvement as detailed above. JA848, JA854.

Appellee Marte also fabricated a story to justify his vote for Rabboh where an unidentified BFPD officer randomly approached him in the Borough's parking lot soon after he was elected to the Council and informed him that Appellant was not a good "team player" and that Rabboh was a "good team worker . . . [he] does good." JA592-93 at 46:21-52:1, JA598 at 71:7-15. Even more concerning, Appellee Marte testified that supervisory experience was not an important factor in his consideration and that it did not matter "how long [Appellant had] been supervising." JA597-98 at 67:5-69:21. Appellee Marte also testified that having a minority department head in the Borough is important, but that he did not consider Rabboh's race when he voted to promote him. JA601 at 81:23-83:1.

### j. The Remaining Interview Attendees Fail to Make Sense of Appellees' Decision to Promote Rabboh over Appellant.

Appellee Kornbluth voted to promote Appellant because of his rank and experience. JA626 at 50:23-51:12. Councilman Lodato voted to promote Appellant because he was "senior in service to the department of anyone else who might [have] be[en] in contention and he was elevated to the position of deputy chief" which he took "as a message that he was doing a good job and he's next." JA635 at 13:3-10. Councilman Lodato testified that Appellant and Rabboh were not equally qualified as Appellant had many additional years of experience working in the BFPD, more responsibility as Deputy Chief and serving as OIC over the years, and greater supervisory experience. JA644-45 at 49:14-50:23. Councilman Lodato testified that there was nothing compelling about Rabboh's interview that justified Rabboh being promoted over Appellant. JA642 at 40:16-41:10. Councilman Lodato also testified that he expected that Appellant would file this lawsuit after being skipped for the promotion. JA646 at 57:7-11. BA Gallo was shocked by Appellees' decision to promote Rabboh. JA694 at 182:4-7. Officers in the BFPD were also surprised when they learned of Rabboh's promotion. JA785 at 26:4-

18, JA795 at 18:25-19:10. Even Rabboh was surprised that he was promoted over Appellant. JA702 at 213:12-17. Community members expressed their shock and disappointment with Appellees' decision to promote Rabboh over Appellant. JA628 at 57:18-58:6. In fact, Bergen County Commissioner Thomas J. Sullivan ("Sullivan") called Appellee Amatorio to inquire about Appellees' decision to promote Rabboh over Appellant to which Appellee Amatorio explained that Appellees believed that Rabboh would be a better fit **since he is a minority**. JA476 at 143:20-145:5. Appellee Amatorio recalled having this conversation with Sullivan. JA525-26 at 152:3-157:4. Sullivan also met with Appellee Deauna who explained that he "only voted the way [Appellee Amatorio] told him to." JA913. This was not surprising as the minority Appellees *always* voted in line with each other. JA716-17 at 31:22-33:22, JA638 at 23:13-17.

### k. Rabboh is Sworn in as Bergen County's First Muslim Chief of Police.

On August 20, 2019, Rabboh was officially sworn in as BFPD Chief in a public ceremony where the Council voted publicly to make Rabboh's promotion official. JA333. At the swearing in ceremony, all Council

members but Councilman Lodato voted for Rabboh as Lodato abstained.

*Id.* Councilman Lodato abstained from the public vote because:

> Well, my feeling was adamant, that I was in favor of Deputy Chief
> Massey being elevated, and I didn't think that just because it's now the
> public session and there is no choice to be made, it's only one candidate,
> I just didn't feel proper doing that.

JA644 at 47:18-48:1.

Councilman Lodato advised Appellee Kornbluth not to vote at the public ceremony because the "public vote is what's going to be binding[]" "[a]nd if you vote yes, you're going to be a defendant in a complaint." JA644 at 48:8-24. However, Appellee Kornbluth explained that she did not have a choice but to vote for Rabboh at his swearing in ceremony because:

> The vote was for Rabboh or no one else, and I felt as a council member,
> once we had a chief up there with no one else on the opposite end of the
> vote, it was important to show support of being a unified council. It
> wasn't a choice of Massey or Rabboh, and I wasn't going to be a no vote.

JA629 at 63:20-64:14.

At Rabboh's swearing in, Appellee Marte stated that "Bergenfield is a safe and friendly town, but no one has named the one thing that makes it the best town to raise a family, which is the diversity." JA333. He provided further that "Bergenfield appointed the first female Police Chief in 2015, and now has appointed the first Muslim Chief in 2015, and

second in the State of New Jersey." *Id.* Appellee Deauna stated that "the make-up of the Council is diversified, and we [were] able to achieve the American Dream." *Id.* Appellee Amatorio stated that Rabboh "expressed that he lives the American dream[]" and that "it was good to hear because many of the people in the audience, and even on the Council, share the same vision, experience and passion." *Id.* Appellee Amatorio also stated that "this is a diverse town, audience, council, and we are proud to have you (Rabboh) as the next Chief of the Police Department." *Id.* Appellee Rivera stated that he felt he "did the right thing" in voting for Rabboh and was "proud" and that he hoped to "continue doing the right thing for the diverse community of Bergenfield." *Id.* BA Gallo testified that Appellees only utilized the "benefits" of Rabboh's race "after the fact." JA701 at 209:16-210:3.

Specifically, Gallo testified:

> **Q. Did you tell [Plaintiff] that Rabboh was promoted because he would have been the first Arab/Muslim chief of police in Bergen County and possibly the state?**
>
> * * * *
>
> **A. Yes.**
>
> Q. When?
> A. Probably after—at some point between the time that I notified Chris and the time that Rabboh was going to be named chief, you know, between the ceremonies, during that time period I had conversations with Chris, different conversations over time.

Q. Do you know if that was a motivating factor in their determination to [promote]?
A. I'm going to say the same thing that I said that related to Madalone.

It is not the reason that they hired her, but after-the-fact, it was a factor that they were able to utilize to their advantage.

It is not a factor for which Rabboh was [promoted], because he was Muslim and he would be the first Muslim chief, but, when they felt he was the right candidate for them, they utilized that to their advantage and they used that to promote the borough, that he was going to be the first Muslim chief.

JA700-01 at 208:23-210:3.

Since being promoted to Chief, the Mayor, Council, and BA Gallo have expressed disappointment with Rabboh's performance. JA688 at 158:5-11, JA703 at 218:12-17, JA629 at 61:6-62:8, JA645 at 52:10-19. In fact, Rabboh admitted that the only new community outreach activity that he has implemented since becoming Chief is a bicycle event. JA767-68 at 120:14-122:18.

## PROCEDURAL HISTORY

On February 24, 2020, Appellant filed a complaint against Appellees alleging claims of reverse racial discrimination under 42 U.S.C. § 1983 and the Fourteenth Amendment's Equal Protection Clause, racial discrimination under 42 U.S.C. § 1981, and reverse racial discrimination under the New Jesey Law Against Discrimination, *N.J.S.A.* 10:5-12, *et seq.* JA36, JA48. Appellees did not file an answer to

Appellant's complaint and, as a result, did not assert any affirmative defenses. JA36. On December 1, 2023, Appellees filed a motion for summary judgment, statement of material facts, and exhibits. JA46, JA58. On January 20, 2024, Appellant filed his response in opposition to Appellees' motion for summary judgment, response to Appellees' statement of material facts, a counterstatement of material facts, and exhibits. JA47, JA365. On February 2, 2024, Appellees filed a reply brief in support of their motion for summary judgment without responding to Appellant's counterstatement of material facts. JA47, JA918. On September 11, 2024, the District Court entered an order and opinion granting Appellees' motion for summary judgment. JA1, JA47. On September 19, 2024, Appellant filed a timely notice of appeal. JA16, JA47.

## RULINGS PRESENTED FOR REVIEW

1.    The District Court's September 11, 2024 entry of summary judgment in favor of Appellees.

## SUMMARY OF THE ARGUMENT

The evidence presented to the District Court proves that Appellees voted to promote Rabboh to BFPD Chief over Appellant because Rabboh is a minority. This evidence consists of Appellant's superior qualifications as compared to Rabboh's, Appellees' own admissions that they voted to promote Rabboh because he is a minority, Appellees inability to articulate an uncontradicted "legitimate, non-discriminatory" reason for their decision, and other background evidence demonstrating that Appellees were motivated by race. However, the District Court failed to consider this overwhelming evidence in any detail and held that Appellant failed to prove his *prima facie* NJLAD claim although the evidence unequivocally supports that Appellees are the "unusual employers who discriminate against the majority." This finding was clearly erroneous and must result in a remand.

The District Court likewise failed to appreciate the thrust of Appellant's Fourteenth Amendment Equal Protection claim by misinterpreting this Court's own precedent and incorrectly holding that such a claim is not viable as a matter of law. This holding constitutes an error of law which must result in a remand.

Although the District Court held that Appellant did not prove his *prima facie* case of reverse racial discrimination under the NJLAD, it still went on to discuss the "legitimate, non-discriminatory reasons" offered by Appellees in a single sentence while dismissing the undisputed evidence offered by Appellant in a footnote. Had the District Court thoroughly evaluated the evidence presented by Appellant, it would have concluded that that every single reason offered by Appellees for their decision to promote Rabboh over Appellant was pretext for racial discrimination. This finding was clearly erroneous and must result in a remand.

Last, the District Court dismissed Appellant's 42 U.S.C. § 1981 racial discrimination claim upon a holding that there is no implied private right of action under the statute. While Appellant agreed with the District Court that there is no implied right of action against *individual state actors*, the precedent clearly establishes that a private right of action does exist against municipalities such as the Borough. However, the District still dismissed Appellant's § 1981 claim against the Borough. This holding constitutes an error of law which must result in a remand.

# ARGUMENT

## I. STANDARD OF REVIEW

This Court exercises plenary review over the District Court's grant of summary judgment and the same standard that the District Court applied in determining whether summary judgment was appropriate. *Reitz v. Cnty. Of Bucks*, 125 F.3d 139, 143 (3d Cir. 1997); *Norfolk S. Ry. v. Basell USA Inc.*, 512 F.3d 86, 91 (3d Cir. 2008). Summary judgment is warranted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Stewart v. Rutgers*, 120 F.3d 426, 431 (3d Cir. 1997) (quoting *Robinson v. PPG Indus. Inc.,* 23 F.3d 1159, 1162 (7th Cir. 1994)).

**II.** **APPELLANT PROVED HIS *PRIMA FACIE* CASE OF REVERSE RACIAL DISCRIMINATION UNDER THE NEW JERSEY LAW AGAINST DISCRIMINATION.**

The District Court erred by holding that Appellant failed to establish a *prima facie* case of reverse racial discrimination under the NJLAD because he did not offer "direct or circumstantial" evidence demonstrating that Appellees are the "unusual employers who discriminate against the majority." Indeed, the evidence demonstrating that Appellees are "unusual employers" is overwhelming, even the direct evidence which "is hard to come by." *See A.D.P. v. ExxonMobil Rsch and Eng'g Co.*, 428 *N.J. Super.* 518, 531-32 (App. Div. 2012) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 271 (1989)). However, the District Court did not consider the abundant undisputed evidence offered by Appellant.

Disparate treatment claims under the NJLAD are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Gerety v. Atl. City Hilton Casino Resort*, 184 *N.J.* 391, 399 (2005). A plaintiff can establish a *prima facie* NJLAD claim by demonstrating: "that he or she (1) belongs to a protected class; (2) applied for or held a position for which he or she was objectively qualified;

(3) was not hired or was terminated from that position; and (4) the employer sought to, or did fill the position with a similarly-qualified [or less-qualified] person." *Id.* "The burden then shifts to the employer to prove a legitimate, non-discriminatory reason for the employment action." *Id.* A "[p]laintiff can respond by showing the employer's proffered reason was merely pretext for the discrimination." *Id.* "Although the discrimination must be intentional," a plaintiff can prove discriminatory intent through "either direct or circumstantial evidence." *Bergen Com. Bank v. Sisler*, 157 *N.J.* 188, 208 (1999).

However, to prove a *prima facie* case of reverse racial discrimination under the NJLAD, ". . . the first prong of the *McDonnell Douglas* framework requires the plaintiff to substantiate . . . that the 'background circumstances support the suspicion that the defendant is the unusual employer who discriminates against the majority.'" *Williams v. Casino Reinvestment Dev. Auth.*, 2021 WL 2934703, at *9 (App. Div. 2021) (quoting *Erickson v. Marsh & McLennan Co.*, 117 *N.J.* 539, 551-52 (1990)); *but see Hopp v. City of Pittsburgh*, 194 F.3d 434, 438 (3d Cir. 1999) (". . . a non-minority claimant does not have to meet a 'heightened standard' in making out a *prima facie* case[]" under Title VII or the Equal

Protection Clause.) (emphasis added). A *prima facie* case of reverse racial discrimination is made on a case-by-case basis. *See DeCapua v. Bell Atl.-N.J., Inc.,* 313 *N.J.Super.* 110, 124 (App. Div. 1998).

A plaintiff can demonstrate "background circumstances" "by establishing either that the plaintiff was better qualified for the position than the minority candidate selected or that the defendant had some reason or inclination to discriminate against the majority class." *Cappella v. City of Atl. City*, 2014 WL 1281516, at *11 (App. Div. 2014) (quoting *Bergen Com. Bank*, 157 *N.J.* at 214); *see also DeCapua v. Bell Atl.-N.J., Inc.,* 313 *N.J. Super.* 110, 122 (Law Div. 1998) ("When an employer acts contrary to its best interests, then it is proper to infer a discriminatory motive."); *see also Miller v. N.J.*, 144 Fed.Appx. 926, 930 (3d Cir. 2005) ("evidence indicating that there is something 'fishy' about the facts of the case at hand that raises an inference of discrimination.") (emphasis added).

### a. Appellant is more qualified than Rabboh.

In this matter, the undisputed evidence demonstrates that Appellant is far more qualified than Rabboh.[3] This is not only evident from Appellant's own credentials and experience as compared to Rabboh's, but from Appellees' own admissions. Notably: Appellant had nearly a decade's more experience as a police officer than Rabboh; Appellant worked in every division in the BFPD other than records while Rabboh only worked in patrol, traffic, and records; Appellant outranked Rabboh and supervised Rabboh his entire career other than the few months where they were both Captains; Appellant ran the entire BFPD as OIC under both Carr and Madalone while Rabboh did not; Appellant narrowly missed out on the promotion to Chief in 2015; Appellant had the Deputy Chief position created specifically for him; Appellant supervised 40 BFPD officers to Rabboh's 4; and Appellant had never been disciplined in his entire career while Rabboh was the target of at least 7 Internal Affairs complaints with the last carrying major discipline.

---

[3] In this matter, Appellees failed to respond to Appellant's counterstatement of material facts in support of his opposition to their motion for summary judgment in violation of LR 56.1 (a) which provides that "any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion." "Facts submitted in the statement of material facts which remain uncontested by the opposing party are deemed admitted." *Hill v. Algor*, 85 F. Supp. 2d 391, 408 (D.N.J. 2000). Thus, Appellant's counterstatement of material facts must be deemed admitted as a result of Appellees' failure to respond to them.

Not only are Appellant's superior qualifications self-evident and prove a *prima facie* case, but Appellees themselves admit that Appellant was more qualified than Rabboh. Chiefly, Appellee Amatorio admitted that Appellant was more experienced in years and serving in a supervisory role. Appellee Rivera admitted that Appellant's experience was "superior" compared to Rabboh's. Oddly enough, Appellee Marte ignored Appellant's superior experience because it "didn't matter" to him. Appellee Kornbluth admitted Appellant had more experience than Rabboh. Councilman Lodato testified that Appellant was more qualified than Rabboh in every category. Appellees cannot deny that Appellant was more qualified than Rabboh.

Here, it is obvious that Appellant is more qualified than Rabboh which proves his *prima facie* case of reverse racial discrimination under the NJLAD. *See Williams*, 2021 WL 2934703, at *9. The District Court did not evaluate or consider this evidence which led to its reversible error and must result in a remand.

**b. The background circumstances surrounding Appellees' decision to promote Rabboh over Appellant are "fishy."**

Appellant also proved his *prima facie* case based on the suspicious "background circumstances" leading up to Rabboh's promotion, and after, that suggest that Appellees conspired to promote Rabboh because he is a minority. While the District Court vaguely addressed Appellees' speeches at Rabboh's swearing in ceremony, it failed to evaluate the totality of circumstances which are "fishy" to say the least.

These notable background circumstances begin with Appellee Rivera confronting Appellant at the police committee meeting about the Civil Service list and stating to Appellant that he did not "look like the people of the Borough." This interaction, while suspicious on its own and indicative of Appellee Rivera's discriminatory intent, is compounded by the fact that Appellee Rivera was the one who suggested that Rabboh be considered for the promotion to Chief. What's more, shortly after the Police Committee meeting, Rabboh gloated to officers Maggi and Ramos that he was going to be promoted to Chief. These background circumstances suggest, as both Appellee Kornbluth and Councilman Lodato suspected, that Appellees conspired before the interviews to

promote Rabboh over Appellant and may have informed Rabboh of their plan.

These background circumstances become more curious when evaluated in combination with the interviews for Chief. Particularly, Appellee Marte's exceptionally late arrival to Rabboh's interview that only allowed him to participate for approximately 5-10 minutes yet still prompted him to openly state that Rabboh answered the questions "better" than Appellant. As if Appellee Marte's conduct was not "fishy" enough, Appellee Deauna informed Sullivan that he only voted for Rabboh because Appellee Amatorio told him to which likewise supports Appellee Kornbluth and Councilman Lodato's suspicion that the minority Appellees conspired before the interviews to promote Rabboh.

With these suspicious background circumstances established, Appellees' speeches at Rabboh's swearing in ceremony all but confirm their plan to promote the "first ever Muslim police Chief in Bergen County." These statements are not general statements "combatting discrimination" or confirming an "affirmative action plan" as the District Court suggested, but rather statements confirming Appellees' agenda or plan "to discriminate against the majority class." *See Cappella*, 2014 WL

1281516, at *11. These "fishy" background circumstances likewise prove Appellant's *prima facie* case of reverse racial discrimination under the NJLAD. Consequently, the District Court committed reversible error which must result in a remand.

## III. THE "LEGITIMATE, NON-DISCRIMINATORY" REASONS OFFERED BY APPELLEES ARE PRETEXT FOR RACIAL DISCRIMINATION.

In this matter, while the District Court incorrectly concluded that Appellant failed to prove his *prima facie* case under the NJLAD, it still went on to vaguely address Appellees' "legitimate non-discriminatory" reasons for their decision to promote Rabboh over Appellant under *McDonnell-Douglas*. In doing so, the District Court concluded—in a single sentence—that that Appellees met their burden of production without discussing their reasoning in any detail. Specifically, the only "legitimate, non-discriminatory" reasons cited by the District Court were Rabboh's experience, plan for community interaction and outreach, and "other strengths." The District Court's decision is further complicated by its dismissal of the evidence presented by Appellant—in a footnote— which conclusively demonstrates that the reasons offered by Appellees are pretext for racial discrimination.

The evidence presented by Appellant demonstrates that Appellees were grasping at straws to fabricate "legitimate, non-discriminatory" reasons to justify their decision to promote Rabboh. It is imperative to address each Appellee individually because each testified that they did not discuss their votes, the candidates, or interviews before the interviews, and that they made their decisions independent of one another although the evidence suggests otherwise. Likewise, there were no similar discussions *after* the interviews because Appellees voted immediately upon their conclusion. According to Appellees' own testimony, their decision to promote Rabboh could not have been a collective one. Notwithstanding, the evidence presented by Appellant demonstrates that all the reasons offered by Appellees are pretext for racial discrimination.

First, Appellee Amatorio testified that one of the reasons that he voted for Rabboh was because his resume was "superior" to Appellant's. However, a cursory review of both resumes demonstrates that they are not comparable in any regard and proves that this reasoning is pretextual. This is further confirmed by Appellee Amatorio's admission that Appellant had more supervisory experience than Rabboh. Appellee

Amatorio also testified that he voted for Rabboh because he had longer to work until he could retire, but did not know how long either candidate had to work until they could retire. Furthermore, the undisputed evidence demonstrates that each candidate committed to working for at least 5 additional years. Thus, this reasoning in pretextual. Last, Appellee Amatorio testified that another reason that he voted for Rabboh was his "5-year plan." However, it is undisputed that Rabboh copied Madalone's plan and that Appellee Amatorio voted to promote Appellant to Chief in 2015 despite Madalone presenting the same plan. Accordingly, this reasoning is pretextual.

Second, Appellee Rivera testified that one of the "major" reasons he voted for Rabboh over Appellant was because he had longer to work until he could retire. However, like Appellee Amatorio, Appellee Rivera did not know how long either candidate had to work until they could retire. Thus, this reasoning is pretextual. Appellee Rivera also testified that he voted for Rabboh because he believed that he could "reach more in the community" which was a concern of his because of an ongoing drug problem at the high school and because residents were afraid of and did not trust the police. However, Appellee Rivera admitted that the Borough

is one of the safest towns in the Country thanks to the BFPD and Appellee Kornbluth, Councilman Lodato, and Mayor Schmeltz confirmed that Appellee Rivera was lying about the high school and residents. Further, Appellant's resume demonstrates that he has been heavily active in the community his entire career while Rabboh's is silent on his community involvement. Accordingly, this reasoning is pretextual.

Third, Appellee Deauna testified that he voted for Rabboh because he was impressed with his resume, but that he did not recall receiving Appellant's resume. As explained above, both Appellant and Rabboh submitted their resumes to the Council at the time of their interviews. Notwithstanding, as previously stated, Rabboh's resume is not comparable to Appellant's, so this reasoning is pretextual. However, Appellee Deauna ultimately admitted that he voted to promote Rabboh because he is a minority which firmly establishes his discriminatory intent.

Last, Appellee Marte testified that he voted for Rabboh because of his interview. However, it is undisputed that Appellee Marte was 31 minutes late to Rabboh's interview and only heard the last few minutes. Thus, this reasoning is pretextual. Appellee Marte also testified that

Rabboh's resume reflected that he was much more active in the community than Appellant which was another reason why he voted for Rabboh. However, as explained above, Rabboh's resume is silent on his community involvement while Appellant's resume demonstrates that he has been actively involved in the community his entire career. Accordingly, this reasoning is pretextual. Appellee Marte also fabricated a story to justify his vote for Rabboh which is simply laughable. Obviously, this reasoning is pretextual. Last, Appellee Marte admitted that he believed that it was important to have a minority Chief and that he did not consider Appellant's significant supervisory experience when voting which proves his discriminatory intent.

Here, Appellant was not required to prove that race was the "sole or exclusive" factor in Appellees' decision; rather he needed only to show "by a preponderance of the evidence that [his race] made a difference" in that decision. *See Murray v. Newark Hous. Auth.*, 311 *N.J. Super.* 163, 174 (Law Div. 1998). Based on the evidence presented by Appellant, a reasonable jury could determine that the Appellees voted to promote Rabboh over Appellant because of Rabboh's race in violation of the NJLAD. Appellant has presented sufficient evidence to create a genuine

dispute of material fact sufficient for a trial on the merits which must result in a remand.

IV. **APPELLANT'S §1983 REVERSE RACIAL DISCRIMINATION CLAIM UNDER THE FOURTEENTH AMENDMENT'S EQUAL PROTECTION CLAUSE WAS PROPERLY PLEADED.**

In this matter, Appellant pleaded a §1983 reverse racial discrimination claim under the Fourteenth Amendment's Equal Protection Clause against Appellees. Although this claim was evident from Appellant's complaint, Appellees dedicated a large portion of their summary judgment brief seeking the dismissal of a Fourteenth Amendment "procedural due process" claim, which Appellant did not plead, without addressing his Equal Protection claim. Notwithstanding, the District Court, relying on *Williams v. Pa. Human Rel. Comm'n*, 870 F.3d 294 (3d Cir. 2017), granted Appellees' motion for summary judgment as to Appellant's Equal Protection claim holding that this Court has "expressly stated that such employment-related claims for race discrimination may not be brought pursuant to Section 1983." However, this is not the holding of *Williams* and the District Court's holding constitutes an error of law which must result in a remand.

In *Williams*, *supra*, this Court held that "while a plaintiff may use §1983 'as a vehicle for vindicating rights independently conferred by the Constitution,' Title VII and ADA statutory rights cannot be vindicated through §1983." *Id.* at 300. The plaintiff in *Williams* attempted to do just that, pursue a Tite VII disparate impact claim through §1983 to circumvent the EEOC notice requirements of Title VII. *Id.* This Court narrowly held that "[a]llowing [a] pure Title VII . . . claim[] under §1983 would thwart Congress's carefully crafted administrative scheme by throwing open a back door to the federal courthouse when the front door is purposefully fortified." *Id.* at 299. However, nowhere in *Williams* did this Court hold that "employment-related claims for race discrimination may not be brought pursuant to Section 1983."

Conversely, this Court has held that "the basis for a §1983 claim is 'independent' from Title VII when it rests on substantive rights provisions outside Title VII—that is, when it rests on a constitutional right or a federal statutory right other than those created by Title VII." *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1079 (3d. Cir. 1990) (emphasis added). In *Bradley*, the District Court ruled—like the District

Court here—that the plaintiff could not pursue her racial discrimination claim under §1983 because the "conduct alleged to be racially discriminatory is within the scope of Title VII . . . and we are not justified in ignoring the specific remedial scheme enacted by Congress in order to proceed directly to Section 1983." *Id.* at 1078-79. However, this Court found that the District Court in *Bradley* "misconstrue[d] the relationship between Title VII and 42 U.S.C. 1983." *Id.* at 1079.

This Court in *Bradley* recognized that the plaintiff's racial discrimination was grounded in the Equal Protection Clause while also being actionable under Title VII. *Id.* In doing so, this Court held that Title VII did not preempt the plaintiff's §1983 Equal Protection claim which was consistent with "every other court of appeals that has decided the question." *Id.* (citing *Keller v. Prince George's Cnty.,* 827 F.2d 952 (4th Cir. 1987); *Johnston v. Harris Cnty. Flood Control Dist.,* 869 F.2d 1565 (5th Cir. 1989), *cert. denied,* 493 U.S. 1019 (1990); *Grano v. Dep. of Dev.,* 637 F.2d 1073 (6th Cir. 1980); *Trigg v. Fort Wayne Cmty. Sch.,* 766 F.2d 299 (7th Cir. 1985); *Roberts v. Coll. of the Desert,* 870 F.2d 1411 (9th Cir. 1988); *Brown v. Hartshorne Pub. Sch. Dist. No. 1,* 864 F.2d 680 (10th Cir. 1988). "Because a cause of action under §1983 is distinct and

independent, and has different procedural, jurisdictional, and remedial characteristics from a Title VII action, [a plaintiff] has the right to proceed under both statutes." *Knoll v. Springfield Twsp. Sch. Dist.*, 699 F.2d 137, 145 (3d Cir. 1983)*, vacated on other grounds*, 471 U.S. 288 (1985).[4]

Here, this Court's precedent clearly establishes that the District Court committed an error of law which must result in a remand. Further, because Appellant has satisfied his burden of proof under *McDonnell-Douglass*, he has likewise proven his §1983 Equal Protection claim which does not carry the same heightened standard in making out a *prima facie* case as the NJLAD. *Iadimarco v. Runyon*, 190 F.3d 151, 161 (3d Cir. 1999); *accord Hopp v. City of Pittsburgh*, 194 F.3d 434, 438 (3d Cir. 1999).

---

[4] "Moreover, the legislative history of Title VII supports 'the clear inference . . . that Title VII was designed to supplement, rather than supplant, existing laws and institutions relating to employment discrimination.'" *Id.* (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 48–9 (1974).

## V. AN IMPLIED CAUSE OF ACTION UNDER 42 U.S.C. § 1981 EXISTS AGAINST THE BOROUGH OF BERGENFIELD.

The District Court committed an error of law by dismissing Appellant's §1981 claim against the Borough based on its application of *McGovern v. City of Philadelphia*, 554 F.3d 114 (3d Cir. 2004). While the District Court correctly held that Appellant could not pursue a §1981 against the individual Appellees—which Appellant conceded in his summary judgment brief—it nonetheless dismissed Appellant's §1981 claim against the Borough without any explanation. However, §1981 *does* create an implied cause of action against the Borough. *Id.* at 121 (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735-36 (1989) (extending *Monell* to cases arising under §1981). Accordingly, the District Court's dismissal of Appellant's §1981 claim against the Borough constitutes reversible error which must result in a remand.

## CONCLUSION

For the foregoing reasons, Appellant respectfully requests that this

Court reverse the decision rendered by the United States District Court

for the District of New Jersey and remand for a trial on the merits.


Respectfully submitted,

/s/ Dylan T. Hastings
Dylan T. Hastings, Esquire
**WILLIAMS CEDAR LLC**
One South Broad Street
Suite 1510
Philadelphia, PA 19107
215-557-0099

March 31, 2025
*Attorney for Plaintiff-Appellant*

## CERTIFICATE OF BAR MEMBERSHIP

I certify that I am a member of the bar for the United States Court of Appeals for the Third Circuit.

/s/ *Dylan T. Hastings*
Dylan T. Hastings

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a) AND LOCAL RULE 31.1

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following: This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 9,657 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using the 2008 version of Microsoft Word in 14 point Century Schoolbook font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and Internxt Virus Scanner has been run on the file containing the electronic version of this brief and no viruses have been detected.

*/s/ Dylan T. Hastings*
Dylan T. Hastings

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 31, 2025, I electronically filed Plaintiff-Appellant's Opening Brief using the appellate CM/ECF system. I also caused a copy of this brief to be served electronically on the following counsel for Defendants-Appellees:

John L. Shahdanian, Esquire
Trenk Isabel Siddiqi & Shahdanian P.C.
Court Plaza South, West Wing
21 Main Street, Suite 251
Hackensack, NJ 07601


*/s/ Dylan T. Hastings*
Dylan T. Hastings

# United States Court Of Appeals
### for the
# Third Circuit

Case No. 24-2761

CHRISTOPHER MASSEY,

*Appellant,*

v.

BOROUGH OF BERGENFIELD, et al.,

*Appellees.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY
DOCKET NO. 2:20-CV-01942, HONORABLE JAMEL K. SEMPER

## JOINT APPENDIX VOLUME I of III

DYLAN T. HASTINGS, ESQUIRE
WILLIAMS CEDAR LLC
*Attorneys for Appellant*
One South Broad Street
Suite 1510
Philadelphia, PA 19107
215-557-0099

## TABLE OF CONTENTS
## Volume I of III

**Page**

Memorandum of the Honorable Jamel K. Semper
dated September 11, 2024 ...................................................... JA001

Order of the Honorable Jamel K. Semper
dated September 11, 2024 ...................................................... JA014

Notice of Appeal
dated September 19, 2024 ...................................................... JA016

<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

CHRISTOPHER MASSEY,

              Plaintiff,

v.

BOROUGH OF BERGENFIELD, ARVIN AMATORIO, HERNANDEZ RIVERA, ORA KORNBLUTH, RAFAEL MARTE, AND BUDDY DEAUNA,

              Defendants.

Civil Action No. 20-01942

**OPINION**

September 11, 2024

**SEMPER**, District Judge.

Before the Court is Defendants Borough of Bergenfield (the "Borough"), Arvin Amatorio, Hernandez Rivera, Ora Kornbluth, Rafael Marte, and Buddy Deauna's (collectively "Defendants") motion for summary judgment. (ECF 110.) Plaintiff Christopher Massey ("Plaintiff" or "Massey") filed a brief in opposition to the motion. (ECF 114, "Opp.") Defendants filed a reply brief. (ECF 116, "Reply.") The Court reviewed the parties' submissions and decided the motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' motion for summary judgment is **GRANTED.**

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

---

[1] The facts and procedural history are drawn from the Complaint, (ECF 1, "Compl."), the parties' submissions regarding undisputed material facts (ECF 110-2, Defendants' Statement of Undisputed Material Facts ("DSMF"), ECF 114-3, Plaintiff's Counterstatement of Undisputed Material Facts, ("PCSMF"), and ECF 114-2, Plaintiff's Supplemental Statement of Undisputed Material Facts "Supp. SMF"), Defendants' brief in support of its motion for summary judgment (ECF 110-1, "Def. Br."), Plaintiff's opposition brief (ECF 114, "Opp."), and Defendants' reply brief. (ECF 116, "Reply.")

This case arises from the 2019 selection of the Bergenfield Police Department's ("BPD") Chief of Police. Plaintiff Massey, who is Caucasian, alleges that the Defendants wrongfully discriminated against him when they selected Mustafa Rabboh, who is Palestinian and Muslim, to be Chief of Police instead of Plaintiff. (*See generally* Compl.)

### A. Christopher Massey

In or about January 1995, Christopher Massey was hired by the BPD as a patrolman/officer.[2] (DSMF ¶ 1.) In or about 2003, Plaintiff took the New Jersey Civil Service test and was promoted to sergeant within the BPD.[3] (*Id.* ¶ 4.) As a sergeant, Plaintiff was assigned to the patrol division. (*Id.* ¶ 5.) Plaintiff supervised patrol officers, monitoring and mentoring those officers daily. (*Id.*) Throughout his tenure as a sergeant, Plaintiff was only assigned to the patrol division, and he never worked in the Detective Bureau. (*Id.* ¶¶ 8-9.) At the time, seven other sergeants worked in the patrol division. (*Id.* ¶ 7.)

In or about 2007, Plaintiff was promoted to lieutenant[4] in the Patrol Division. (*Id.* ¶ 10.) As a lieutenant, Plaintiff oversaw a platoon. (*Id.* ¶ 11.) He was responsible for mentoring and training sergeants and ensuring they properly supervised the dispatchers and patrolmen. (*Id.*) If no sergeant was working with Plaintiff, Plaintiff would act as a sergeant himself. (*Id.*) Moreover, Plaintiff was in charge of field training for the entire patrol division. (*Id.* ¶ 12.) As a lieutenant, Plaintiff became the main investigator for Internal Affairs, liaison for the BPD and Bergenfield schools, liaison for the BPD and the Bergen County Prosecutor's Office, liaison with Civil Service,

---

[2] "During an assigned tour of duty, on foot, or in an automobile, [a patrolman/officer] patrols a designated area to provide assistance and protection for persons, to safeguard property, to assure observance of the law, and to apprehend law-breaks; does related work as required." (DSMF ¶ 3.)

[3] "Under supervision of a Police Lieutenant during an assigned Tour of duty, [a sergeant] has charge of police activities intended to provide Assistance [sic] and protection for persons, safeguard property, and assure observance of the laws, and apprehends lawbreakers; does related work as required." (DSMF ¶ 6.)

[4] "Under the supervision of the Police Captain during an assigned tour of duty, [a lieutenant] has charge of a police platoon or performs specialized supervisory police duties; does related work as required." (DSMF ¶ 18.)

**JA002**

and conducted background investigations for new hires. (*Id.* ¶ 14.)

In 2009, Plaintiff was assigned to be a lieutenant in the Detective Bureau. (*Id.* ¶ 13.) In this role, Plaintiff was tasked with more administrative work than in his role as lieutenant in the Patrol Division. (*Id.* ¶ 15.) From about 2009 until 2012, Plaintiff worked solely as a lieutenant in the Detective Bureau and conducted all Internal Affairs investigations. (*Id.* ¶ 17.)

### B. Plaintiff's Promotion to Captain and Cathy Madalone

In or around 2012, Plaintiff was promoted to captain.[5] (*Id.* ¶ 19.) He was a commander of patrol/operations and the Detective Bureau. (*Id.*) Plaintiff remained in these positions throughout his tenure as a captain. (*Id.*) As captain and commander of operations, Plaintiff was responsible for all the dispatchers, lieutenants, sergeants, and patrol officers on patrol. (*Id.* ¶ 22.) He reviewed all reports that came through patrol, ensured they were properly executed, and signed off on the reports. (*Id.*)

Cathy Madalone and Plaintiff were both promoted to captain within the BPD. (*Id.* ¶ 20.) As a captain, Madalone was the commander of Traffic and Records. (*Id.* ¶ 21.) If Cathy Madalone was absent, Plaintiff would oversee Traffic and Records and take a less hands-on approach compared to Madalone's. (*Id.* ¶ 23.)

In mid to late 2015, Madalone was promoted to Chief of Police over Plaintiff. (*Id.* ¶¶ 25-26.) On June 21, 2016, Plaintiff was promoted to Deputy Chief of the BPD.[6] (*Id.* ¶ 27.) As Deputy Chief, Plaintiff was given additional duties he did not have in his role as a captain, including responsibility for the annual report to document department wellbeing and responsibility for

---

[5] "Under the supervision of the Chief or Deputy Chief of Police during an assigned tour of duty, [a captain] has charge of subordinates engaged in activities intended to provide assistance and protection for persons, safeguard property, assure observance of the laws, and apprehend lawbreakers; does related work as necessary." (DSMF ¶ 24.)

[6] "[Deputy Police Chief a]ssists to the police chief in management and discipline of a county or municipal police department; does other related duties." (DSMF ¶ 29.)

equipment purchases and reserves. (*Id.* ¶ 28.) Prior to Plaintiff being named Deputy Chief, the Deputy Chief position was nonexistent for approximately twenty years. (*Id.* ¶ 30.) It was recreated by an ordinance. (*Id.*) The Deputy Chief position was created for Plaintiff after Madalone requested such creation from the Bergenfield Mayor and Council. (*Id.* ¶ 31.)

Defendants assert that "[t]he return of the Deputy Chief position was not done so that Plaintiff would not be skipped over for a chief of police promotion." (*Id.* ¶ 32.) Plaintiff denies this assertion, and instead states that "[t]he Council understood that promoting Plaintiff to Deputy Chief would provide the BPD with a 'defined succession plan' for the rank of Chief upon Madalone's retirement especially considering how close the vote between Plaintiff and Madalone was." (PCSMF ¶ 32.) While Madalone was Chief, Plaintiff was named officer in charge in her absence. (DSMF ¶ 33.)

### C. Mustafa Rabboh

In September 2003, the BPD hired Mustafa Rabboh ("Rabboh") as a lateral transfer. (*Id.* ¶ 35.) Prior to this, Rabboh worked as an officer in the Paterson Police Department. (*Id.* ¶ 36.) In or about 2009, Rabboh took the New Jersey Civil Service test. (*Id.* ¶ 37.) He was the top scorer, and he was promoted to sergeant in the BPD. (*Id.*) As a sergeant, Rabboh was assigned to the Patrol Division, as Plaintiff was during his time as a sergeant. (*Id.* ¶ 38.)

In or about 2012, Rabboh took the New Jersey Civil Service test. (*Id.* ¶ 39.) He was the top scorer, and he was promoted to lieutenant in the BPD. (*Id.*)

In or about 2015, Rabboh was promoted to captain. (*Id.* ¶ 40.) For a time, Plaintiff and Rabboh were simultaneously captains within the BPD. (*Id.* ¶ 41.) As a captain, Rabboh was assigned to Records and Traffic. (*Id.* ¶ 42.) He also oversaw scheduling and accreditation. (*Id.* ¶ 43.) Prior to this, Madalone handled accreditation for fifteen years. (*Id.* ¶ 44.) Plaintiff neither

**JA004**

handled nor took charge of the BPD accreditation process. (*Id.* ¶ 45.) Defendants assert that Plaintiff was never assigned to or worked in Records or Traffic, while Plaintiff asserts he was in charge of Records and Traffic as officer in charge under Madalone for about five to six months. (*Id.* ¶ 46; PCSMF ¶ 46.) Plaintiff trusted Rabboh and, on several occasions, named him officer in charge in Plaintiff's absence. (DSMF ¶ 47.)

In 2019, then Chief of Police Madalone took an extended medical leave. (*Id.* ¶ 49.) During this time, Plaintiff was named officer in charge. (*Id.*) Chief Madalone ultimately retired, and the BPD needed a new Chief of Police. (*Id.* ¶ 50.) Based on an August 1, 2019 New Jersey Civil Service Commission Promotional Announcement, police officers who served as Deputy Police Chief or captain were eligible for a promotion to the position of Chief of Police. (*Id.* ¶ 51.) Both Plaintiff and Rabboh were eligible to apply. (*Id.* ¶ 52.) Rabboh was not required to submit a formal application to be considered for the Chief position. (*Id.* ¶ 53.)

### D. Chief of Police Interviews

The Chief of Police interviews were held on August 6, 2019 in a closed executive session of the Bergenfield Mayor and Council. (*Id.* ¶ 57.) The following individuals attended the interviews: former mayor Norman Schmelz, former council president and current councilmember Ora Kornbluth, councilmember Thomas Lodato, councilmember Buddy Deauna, councilmember and current mayor Arvin Amatorio, councilmember Hernando Rivera, councilmember Rafael Marte, Borough Administrator Corey Gallo, and Deputy Borough Clerk Hilda Tavitian. (*Id.* ¶ 58.)

In preparation for the Chief of Police interview, Rabboh contacted Madalone and requested a copy of a five-year plan she submitted when she interviewed for the Chief of Police position. (*Id.* ¶ 54.) She provided the plan to Rabboh via email. (*Id.*) Madalone also sent her five-year plan to Plaintiff, but Plaintiff did not "read it heartily." (*Id.* ¶ 55.) Defendants assert that in preparation for

5

**JA005**

the interview, Rabboh created his own five-year plan based on his own thoughts and ideas for the BPD, despite not being asked or required to submit one. (*Id.* ¶ 56.) Plaintiff disputes this notion and asserts that Rabboh's five-year plan mirrored Madalone's. (PCSMF ¶ 56.)

During his interview, Rabboh submitted his five-year plan to the mayor, counsel, and others present. (DSMF ¶ 59.) Those present at the interview asked Rabboh various question. (*Id.* ¶ 60.) When asked why he was more qualified than Plaintiff for the Chief position, Rabboh responded that he was there to tell interviewers what he brought to the table, and he would let other candidates speak for themselves. (*Id.* ¶ 61.) Rabboh discussed his strengths, including his social media involvement, tenure as the public information officer, community orientation, experience running the Youth Academy, and his desire to form a closer relationship between the Bergenfield community and the BPD. (*Id.* ¶ 63.) While Defendants assert that this focus on community interaction and outreach "caught the attention of some councilmembers[,]" Plaintiff asserts that this was not the case as some councilmembers found Rabboh's statements on this to be "a general description" or did not remember that aspect of his interview. (DSMF ¶ 64; PCSMF ¶ 64.) Defendants assert that Plaintiff did not discuss community interaction during his interview, but Plaintiff again disputes this assertion. (DSMF ¶ 64; PCSMF ¶ 64.) Plaintiff and Rabboh were asked similar questions during their interviews. (DSMF ¶ 70.) Plaintiff believed the interview process was a sham. (*Id.* ¶ 72.)

### E.  The Vote for Chief

In Bergenfield, four councilmembers constitute a majority for voting purposes.[7] (*Id.* ¶ 78.) At the August 6, 2019 closed session meeting of the Council, councilmembers Marte, Deauna,

---

[7] Former Mayor Schmeltz was not eligible to vote unless there was a tie amongst the councilmembers. (DSMF ¶ 75.) Borough Administrator Gallo did not have the authority to promote anyone, including Plaintiff, to Chief as such decision was required to be voted on by Council at a regular open meeting. (*Id.* ¶ 76.) Defendants assert that Gallo did not recommend anyone for the Chief position. (*Id.* ¶ 77.) Plaintiff specifically denies this asserted fact, and instead

6

Amatorio, and Rivera stated their support for Rabboh for Chief, while Kornbluth and Lodato supported Plaintiff. (*Id.* ¶ 79.) On August 20, 2019, at the Bergenfield Regular Mayor and Council Meeting ("August 20 Meeting"), the Council took an official vote and named Rabboh Chief. (*Id.* ¶ 82.) Defendants assert Kornbluth changed her support from Plaintiff to Rabboh at this meeting. (*Id.* ¶ 81.) Plaintiff challenges this assertion, stating that Kornbluth did not have a choice but to change her vote to Rabboh because "[t]he vote was for Rabboh or no one else[.]" (PCSMF ¶ 81.)

Defendants state that at no time during the August 20 Meeting was it stated or implied that race was a motivating, influential, or deciding factor in promoting Rabboh to Chief of Police. (DSMF ¶ 83.) Plaintiff disputes this assertion and cites to the minutes from the August 20 Meeting, in which councilmembers made comments regarding the value of diversity, the diversity of Bergenfield, and the American Dream. (PCSMF ¶ 83.) Defendants assert that Bergenfield councilmembers and employees agreed race was not considered when promoting Rabboh to Chief. (DSMF ¶ 88.) Plaintiff denies this assertion and cites to testimony from Defendant Deauna in which Deauna stated Rabboh was better suited for Chief because he was more "energetic" and because "he's a minority." (PCSMF ¶ 83.)

During the relevant period, BPD retained a Recruitment/Equal Employment Opportunity General Order, which included an Affirmative Action Policy Statement. (DSMF ¶ 84.) The Affirmative Action Policy Statement provides: "Base decisions on employment so as to further the principal of equal employment opportunity and appropriate community representation while following the guidelines of the New Jersey Civil Service Commission." (*Id.* ¶ 84.) Plaintiff admits the BPD Order included the Affirmative Action Policy Statement, but he denies this is a material fact because the Affirmative Action Policy applies to hiring, not promotions. (PCSMF ¶¶ 84-85.)

---

asserts that Gallo recommended that Plaintiff be made Chief based on Gallo's strong working relationship with Plaintiff. (PCSMF ¶ 77.)

In his Supplemental Statement of Undisputed Material Facts, Plaintiff describes other statements made by Defendants at the August 20 Meeting. Defendant Marte stated that "Bergenfield is a safe and friendly town, but no one has named the one thing that makes it the best town to raise a family, which is the diversity." (Supp. SMF ¶ 154.) Defendant Marte also said that "Bergenfield appointed the first female Police Chief in 2015, and now has appointed the first Muslim Chief in 2015, and second in the State of New Jersey." (*Id.* ¶ 155.) Defendant Deauna stated that "the make-up of the Council is diversified, and we [were] able to achieve the American Dream." (*Id.* ¶ 156.) Defendant Amatorio also stated that Rabboh "expressed that he lives the American dream[]" and that "it was good to hear because many of the people in the audience, and even on the Council, share the same vision, experience and passion." (*Id.* ¶ 157.) Defendant Amatorio also stated that "this is a diverse town, audience, council, and we are proud to have you (Rabboh) as the next Chief of the Police Department." (*Id.* ¶ 158.) Defendant Rivera stated that he felt he "did the right thing" in voting for Rabboh, he was "proud[,]" and he hoped to "continue doing the right thing for the diverse community of Bergenfield." (*Id.* ¶ 158.) Plaintiff also states that Defendant Amatorio is Filipino (*id.* ¶ 13), Defendant Rivera is Colombian (*id.* ¶ 15), Defendant Deauna is Filipino (*id.* ¶ 17), and Defendant Marte is Dominican (*id.* ¶ 19).

Plaintiff's Complaint asserts three counts: Count 1: violation of 42 U.S.C. § 1983 based on violations of the equal protection clause (Compl. ¶¶ 32-34); Count 2: violation of the New Jersey Law Against Discrimination (*id.* ¶¶ 35-38); and Count 3: violation of 42 U.S.C. § 1981 based on alleged race discrimination. (*Id.* ¶¶ 39-41.) Defendants move for summary judgment on all three counts.

II.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted if the movant shows that "there is no genuine issue as to any material fact [and] the moving party is entitled to a judgment as a matter of law." *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an

affidavit."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23). Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.

## III.    ANALYSIS

### A.  Section 1983

Although Plaintiff's Complaint states that his Section 1983 claim is based on an equal protection violation, Defendants analyze Plaintiff's Section 1983 claim using a procedural due process standard. (Def. Br. at 5-9.) In his opposition brief, Plaintiff argues his Section 1983 claim is grounded in an equal protection violation based on Defendants' failure to promote Plaintiff due to reverse race discrimination. (Opp. at 3-5.) However, Plaintiff's analysis is based on the standard for Title VII reverse race discrimination claims. (*Id.*) Plaintiff asserts that failure to promote claims based on reverse race discrimination may be brought pursuant to Section 1983 or Title VII. (*Id.* at 4.) Nevertheless, the Third Circuit has expressly stated that such employment-related claims for race discrimination may not be brought pursuant to Section 1983. *Williams v. Pa. Human Rels. Comm'n*, 870 F.3d 294, 299 (3d Cir. 2017) ("Allowing pure Title VII and ADA claims under § 1983 would thwart Congress's carefully crafted administrative scheme by throwing open a back door to the federal courthouse when the front door is purposefully fortified."). Accordingly, summary judgment is granted in Defendants' favor on Count 1.

### B.  Section 1981

Defendants argue that Plaintiff's Section 1981 claim must be dismissed because there is no private right of action under Section 1981. (Def. Br. at 15-16.) The Court agrees. The Third Circuit has held that "no implied private right of action exists against state actors under 42 U.S.C. § 1981." *McGovern v. City of Phila.*, 554 F.3d 114, 122 (3d Cir. 2009). Accordingly, summary judgment is granted in Defendants' favor on Count 3.

### C.  NJLAD

Defendants likewise move for summary judgment on Plaintiff's NJLAD claim. To establish a prima facie case for failure to promote under the NJLAD, a plaintiff generally must show: "(1) that [he] is a member of a class protected by the anti-discrimination law; (2) that [he] was qualified for the position or rank sought; (3) that [he] was denied promotion, reappointment, or tenure; and (4) that others . . . with similar or lesser qualifications achieved the rank or position." *Glenn v. Lawrence Twp. Police Dep't*, No. 10-3121, 2012 U.S. Dist. LEXIS 37241, at *15 (D.N.J. Mar. 19, 2012) (alterations in original) (quoting *Dixon v. Rutgers, The State Univ. of N.J.*, 541 A.2d 1046, 1051-52 (N.J. 1988)).

However, in cases involving reverse race discrimination, an employee must demonstrate "he has been victimized by an 'unusual employer who discriminates against the majority.'" *Ditzel v. Univ. of Med. & Dentistry*, 962 F. Supp. 595, 603 (D.N.J. 1997) (quoting *Erickson v. Marsh & McLennan Co.*, 569 A.2d 793, 799 (N.J. 1990) (quoting *Livingston v. Roadway Express*, 802 F.2d 1250, 1252 (10th Cir. 1986))). Unlawful discrimination under the NJLAD "may be proven by either direct or circumstantial evidence." *A.D.P. v. ExxonMobil Research & Eng'g Co.*, 54 A.3d 813, 821 (N.J. Super. Ct. App. Div. 2012). Direct evidence of discrimination is evidence "that an employer placed substantial reliance on a proscribed discriminatory factor in making its decision

11

**JA011**

to take the adverse employment action[.]" *McDevitt v. Bill Good Builders, Inc.*, 816 A.2d 164, 168 (N.J. 2003). "The evidence produced must, if true, demonstrate not only a hostility toward members of the employee's class, but also a direct causal connection between that hostility and the challenged employment decision." *Bergen Com. Bank v. Sisler*, 723 A.2d 944, 954 (N.J. 1999). Here, Plaintiff has not set forth any direct evidence of discrimination. Accordingly, Plaintiff must establish unlawful discrimination through circumstantial evidence.

When relying on circumstantial evidence, a plaintiff must present "background circumstances" suggesting that defendants engaged in discrimination. *See Devito v. Bd. of Educ.*, 29 F. App'x 886, 889 (3d Cir. 2002). To support his allegations that Defendants engaged in discrimination, Plaintiff asserts that the Defendants who voted for Rabboh and Rabboh himself are all racial minorities. (Opp. at 6.) However, standing alone, the minority status of individuals who grant or receive preferential employment treatment is not enough to establish background circumstances suggesting discrimination. *Devito*, 29 F. App'x at 889. Plaintiff also asserts that some of Defendants' statements about Rabboh's minority status constitute evidence of discrimination. (Opp. at 7-8.) Furthermore, Plaintiff argues that Defendants' speeches at the August 20 Meeting were centered on Rabboh's race and religion. (Opp. at 9.) In *Wachstein v. Slocum*, the New Jersey Appellate Division explained that "[i]f an employer's statements that he planned to combat discrimination and to pursue affirmative action goals were held to be an adequate basis for a finding of discrimination against a white employee, anti-discrimination laws would be turned on their head and transformed into a device for preservation of the racial status quo in the workforce." 625 A.2d 527, 533 (N.J. Super. Ct. App. Div. 1993). Similarly here, Defendants' statements about Rabboh's minority status, the American Dream, and the value of diversity do not form an adequate basis to establish background circumstances suggesting Defendants engaged in racial

**JA012**

discrimination against Plaintiff. Accordingly, Plaintiff has not established background circumstances to support a prima facie case of reverse race discrimination.

Even if Plaintiff established a prima facie case, his claim would still fail. If a plaintiff establishes a prima facie reverse race discrimination case, the burden of production shifts to the defendant, who must articulate a legitimate, non-discriminatory reason for his or her actions. *Ditzel*, 962 F. Supp. at 603. This burden of production is satisfied if the defendant introduces evidence that, if taken as true, permits a "conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).[8] Here, Defendants proffer several reasons for why they hired Rabboh, including his experience, history of community engagement and outreach, five-year plan, and other strengths as a candidate. (*See, e.g.*, DSMF ¶¶ 62-63.) These reasons are sufficient to satisfy Defendants' burden of production.

Accordingly, summary judgment is granted in Defendants' favor on Count 2.

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (ECF 110) is **GRANTED**. An appropriate order follows.

*/s/ Jamel K. Semper*
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig:    Clerk
cc:      José R. Almonte, U.S.M.J.
         Parties

---

[8] Thereafter, the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the defendant's purported nondiscriminatory reason was merely a pretext for discrimination. *Zive v. Stanley Roberts, Inc.*, 867 A.2d 1133, 1139 (N.J. 2005). "This is satisfied if a plaintiff can show that '(1) a discriminatory reason more likely motivated the employer than the employer's proffered legitimate reason, or (2) the defendant's proffered explanation is "unworthy of credence."'" *Glenn*, 2012 U.S. Dist. LEXIS 37241, at *17 (quoting *Maiorino v. Schering-Plough Corp.*, 695 A.2d 353, 365 (N.J. Super. Ct. App. Div. 1997) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981))). Plaintiff has not shown that Defendants' proffered reasons are merely a pretext for discrimination.

**JA013**

<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

CHRISTOPHER MASSEY,

       Plaintiff,

v.

BOROUGH OF BERGENFIELD, ARVIN
AMATORIO, HERNANDEZ RIVERA,
ORA KORNBLUTH, RAFAEL MARTE,
AND BUDDY DEAUNA,

       Defendants.

---

Civil Action No. 20-01942

**ORDER**

September 11, 2024

**SEMPER**, District Judge.

       **THIS MATTER** comes before the Court on Defendants Borough of Bergenfield, Arvin Amatorio, Hernandez Rivera, Ora Kornbluth, Rafael Marte, and Buddy Deauna's (collectively "Defendants") motion for summary judgment. (ECF 110.) Plaintiff Christopher Massey ("Plaintiff" or "Massey") filed a brief in opposition to the motion. (ECF 114.) Defendants filed a reply brief. (ECF 116.) The Court reviewed the parties' submissions and decided the motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth in this Court's September 11, 2024 opinion,

       **IT IS** on this 11th day of September 2024,

       **ORDERED** that Defendants' motion for summary judgment is **GRANTED**, and the matter shall be marked **CLOSED**.

       **SO ORDERED.**

**JA014**

_/s/ Jamel K. Semper_____
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig:  Clerk
cc:    José R. Almonte, U.S.M.J.
        Parties

## NOTICE OF APPEAL
### TO U.S. COURT OF APPEALS, THIRD CIRCUIT

**From United States District Court
for the District of New Jersey**

| | | |
|---|---|---|
| CHRISTOPHER MASSEY, | : | **CIRCUIT COURT** |
| | : | **DOCKET NUMBER:**_____ |
| Plaintiff, | : | |
| | : | **DISTRICT COURT** |
| v. | : | **DOCKET NUMBER:** |
| | : | **2:20-cv-01942** |
| BOROUGH OF BERGENFIELD, et al., | : | |
| | : | **DISTRICT COURT JUDGE** |
| Defendants. | : | **JAMEL K. SEMPER** |
| | : | |
| | : | **NOTICE OF APPEAL** |

Notice is hereby given that Plaintiff in the above-captioned case, Christopher Massey, appeals to the U.S. Court of Appeals for the Third Circuit from the following Order and Memorandum entered in this action: September 11, 2024 Memorandum and Order [ECF Nos. 117 and 118] granting Defendants' motion for summary judgment. The Memorandum and Order granting Defendants' motion for summary judgment are attached hereto.

**WILLIAMS CEDAR LLC**

/s/ Dylan T. Hastings
Dylan T. Hastings, Esquire
One South Broad Street, Suite 1510
Philadelphia, PA 19107
P: (215) 557-0099
F: (215) 557-0673
dhastings@williamscedar.com
*Counsel for Christopher Massey*

Dated: September 19, 2024

## <u>NOTICE OF APPEAL</u>
### TO U.S. COURT OF APPEALS, THIRD CIRCUIT

**From United States District Court
for the District of New Jersey**

| | | |
|---|---|---|
| CHRISTOPHER MASSEY, | : | **CIRCUIT COURT** |
| | : | **DOCKET NUMBER:**_____ |
| Plaintiff, | : | |
| | : | **DISTRICT COURT** |
| v. | : | **DOCKET NUMBER:** |
| | : | **2:20-cv-01942** |
| BOROUGH OF BERGENFIELD, et al., | : | |
| | : | **DISTRICT COURT JUDGE** |
| Defendants. | : | **JAMEL K. SEMPER** |
| | : | |
| | : | **NOTICE OF APPEAL** |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that Plaintiff's Notice of Appeal was served upon all parties via ECF on the date indicated below.

**WILLIAMS CEDAR LLC**

/s/ Dylan T. Hastings_____
Dylan T. Hastings, Esquire
One South Broad Street, Suite 1510
Philadelphia, PA 19107
P: (215) 557-0099
F: (215) 557-0673
dhastings@williamscedar.com
*Counsel for Christopher Massey*

Dated: September 19, 2024

**JA017**

<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CHRISTOPHER MASSEY, | Civil Action No. 20-01942 |
| Plaintiff, | |
| v. | **OPINION** |
| BOROUGH OF BERGENFIELD, ARVIN AMATORIO, HERNANDEZ RIVERA, ORA KORNBLUTH, RAFAEL MARTE, AND BUDDY DEAUNA, | September 11, 2024 |
| Defendants. | |

**SEMPER**, District Judge.

Before the Court is Defendants Borough of Bergenfield (the "Borough"), Arvin Amatorio, Hernandez Rivera, Ora Kornbluth, Rafael Marte, and Buddy Deauna's (collectively "Defendants") motion for summary judgment. (ECF 110.) Plaintiff Christopher Massey ("Plaintiff" or "Massey") filed a brief in opposition to the motion. (ECF 114, "Opp.") Defendants filed a reply brief. (ECF 116, "Reply.") The Court reviewed the parties' submissions and decided the motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' motion for summary judgment is **GRANTED.**

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

---

[1] The facts and procedural history are drawn from the Complaint, (ECF 1, "Compl."), the parties' submissions regarding undisputed material facts (ECF 110-2, Defendants' Statement of Undisputed Material Facts ("DSMF"), ECF 114-3, Plaintiff's Counterstatement of Undisputed Material Facts, ("PCSMF"), and ECF 114-2, Plaintiff's Supplemental Statement of Undisputed Material Facts "Supp. SMF"), Defendants' brief in support of its motion for summary judgment (ECF 110-1, "Def. Br."), Plaintiff's opposition brief (ECF 114, "Opp."), and Defendants' reply brief. (ECF 116, "Reply.")

This case arises from the 2019 selection of the Bergenfield Police Department's ("BPD") Chief of Police. Plaintiff Massey, who is Caucasian, alleges that the Defendants wrongfully discriminated against him when they selected Mustafa Rabboh, who is Palestinian and Muslim, to be Chief of Police instead of Plaintiff. (*See generally* Compl.)

### A. Christopher Massey

In or about January 1995, Christopher Massey was hired by the BPD as a patrolman/officer.[2] (DSMF ¶ 1.) In or about 2003, Plaintiff took the New Jersey Civil Service test and was promoted to sergeant within the BPD.[3] (*Id.* ¶ 4.) As a sergeant, Plaintiff was assigned to the patrol division. (*Id.* ¶ 5.) Plaintiff supervised patrol officers, monitoring and mentoring those officers daily. (*Id.*) Throughout his tenure as a sergeant, Plaintiff was only assigned to the patrol division, and he never worked in the Detective Bureau. (*Id.* ¶¶ 8-9.) At the time, seven other sergeants worked in the patrol division. (*Id.* ¶ 7.)

In or about 2007, Plaintiff was promoted to lieutenant[4] in the Patrol Division. (*Id.* ¶ 10.) As a lieutenant, Plaintiff oversaw a platoon. (*Id.* ¶ 11.) He was responsible for mentoring and training sergeants and ensuring they properly supervised the dispatchers and patrolmen. (*Id.*) If no sergeant was working with Plaintiff, Plaintiff would act as a sergeant himself. (*Id.*) Moreover, Plaintiff was in charge of field training for the entire patrol division. (*Id.* ¶ 12.) As a lieutenant, Plaintiff became the main investigator for Internal Affairs, liaison for the BPD and Bergenfield schools, liaison for the BPD and the Bergen County Prosecutor's Office, liaison with Civil Service,

---

[2] "During an assigned tour of duty, on foot, or in an automobile, [a patrolman/officer] patrols a designated area to provide assistance and protection for persons, to safeguard property, to assure observance of the law, and to apprehend law-breaks; does related work as required." (DSMF ¶ 3.)

[3] "Under supervision of a Police Lieutenant during an assigned Tour of duty, [a sergeant] has charge of police activities intended to provide Assistance [sic] and protection for persons, safeguard property, and assure observance of the laws, and apprehends lawbreakers; does related work as required." (DSMF ¶ 6.)

[4] "Under the supervision of the Police Captain during an assigned tour of duty, [a lieutenant] has charge of a police platoon or performs specialized supervisory police duties; does related work as required." (DSMF ¶ 18.)

and conducted background investigations for new hires. (*Id.* ¶ 14.)

In 2009, Plaintiff was assigned to be a lieutenant in the Detective Bureau. (*Id.* ¶ 13.) In this role, Plaintiff was tasked with more administrative work than in his role as lieutenant in the Patrol Division. (*Id.* ¶ 15.) From about 2009 until 2012, Plaintiff worked solely as a lieutenant in the Detective Bureau and conducted all Internal Affairs investigations. (*Id.* ¶ 17.)

**B.  Plaintiff's Promotion to Captain and Cathy Madalone**

In or around 2012, Plaintiff was promoted to captain.[5] (*Id.* ¶ 19.) He was a commander of patrol/operations and the Detective Bureau. (*Id.*) Plaintiff remained in these positions throughout his tenure as a captain. (*Id.*) As captain and commander of operations, Plaintiff was responsible for all the dispatchers, lieutenants, sergeants, and patrol officers on patrol. (*Id.* ¶ 22.) He reviewed all reports that came through patrol, ensured they were properly executed, and signed off on the reports. (*Id.*)

Cathy Madalone and Plaintiff were both promoted to captain within the BPD. (*Id.* ¶ 20.) As a captain, Madalone was the commander of Traffic and Records. (*Id.* ¶ 21.) If Cathy Madalone was absent, Plaintiff would oversee Traffic and Records and take a less hands-on approach compared to Madalone's. (*Id.* ¶ 23.)

In mid to late 2015, Madalone was promoted to Chief of Police over Plaintiff. (*Id.* ¶¶ 25-26.) On June 21, 2016, Plaintiff was promoted to Deputy Chief of the BPD.[6] (*Id.* ¶ 27.) As Deputy Chief, Plaintiff was given additional duties he did not have in his role as a captain, including responsibility for the annual report to document department wellbeing and responsibility for

---

[5] "Under the supervision of the Chief or Deputy Chief of Police during an assigned tour of duty, [a captain] has charge of subordinates engaged in activities intended to provide assistance and protection for persons, safeguard property, assure observance of the laws, and apprehend lawbreakers; does related work as necessary." (DSMF ¶ 24.)

[6] "[Deputy Police Chief a]ssists to the police chief in management and discipline of a county or municipal police department; does other related duties." (DSMF ¶ 29.)

equipment purchases and reserves. (*Id.* ¶ 28.) Prior to Plaintiff being named Deputy Chief, the Deputy Chief position was nonexistent for approximately twenty years. (*Id.* ¶ 30.) It was recreated by an ordinance. (*Id.*) The Deputy Chief position was created for Plaintiff after Madalone requested such creation from the Bergenfield Mayor and Council. (*Id.* ¶ 31.)

Defendants assert that "[t]he return of the Deputy Chief position was not done so that Plaintiff would not be skipped over for a chief of police promotion." (*Id.* ¶ 32.) Plaintiff denies this assertion, and instead states that "[t]he Council understood that promoting Plaintiff to Deputy Chief would provide the BPD with a 'defined succession plan' for the rank of Chief upon Madalone's retirement especially considering how close the vote between Plaintiff and Madalone was." (PCSMF ¶ 32.) While Madalone was Chief, Plaintiff was named officer in charge in her absence. (DSMF ¶ 33.)

### C. Mustafa Rabboh

In September 2003, the BPD hired Mustafa Rabboh ("Rabboh") as a lateral transfer. (*Id.* ¶ 35.) Prior to this, Rabboh worked as an officer in the Paterson Police Department. (*Id.* ¶ 36.) In or about 2009, Rabboh took the New Jersey Civil Service test. (*Id.* ¶ 37.) He was the top scorer, and he was promoted to sergeant in the BPD. (*Id.*) As a sergeant, Rabboh was assigned to the Patrol Division, as Plaintiff was during his time as a sergeant. (*Id.* ¶ 38.)

In or about 2012, Rabboh took the New Jersey Civil Service test. (*Id.* ¶ 39.) He was the top scorer, and he was promoted to lieutenant in the BPD. (*Id.*)

In or about 2015, Rabboh was promoted to captain. (*Id.* ¶ 40.) For a time, Plaintiff and Rabboh were simultaneously captains within the BPD. (*Id.* ¶ 41.) As a captain, Rabboh was assigned to Records and Traffic. (*Id.* ¶ 42.) He also oversaw scheduling and accreditation. (*Id.* ¶ 43.) Prior to this, Madalone handled accreditation for fifteen years. (*Id.* ¶ 44.) Plaintiff neither

**JA021**

handled nor took charge of the BPD accreditation process. (*Id.* ¶ 45.) Defendants assert that Plaintiff was never assigned to or worked in Records or Traffic, while Plaintiff asserts he was in charge of Records and Traffic as officer in charge under Madalone for about five to six months. (*Id.* ¶ 46; PCSMF ¶ 46.) Plaintiff trusted Rabboh and, on several occasions, named him officer in charge in Plaintiff's absence. (DSMF ¶ 47.)

In 2019, then Chief of Police Madalone took an extended medical leave. (*Id.* ¶ 49.) During this time, Plaintiff was named officer in charge. (*Id.*) Chief Madalone ultimately retired, and the BPD needed a new Chief of Police. (*Id.* ¶ 50.) Based on an August 1, 2019 New Jersey Civil Service Commission Promotional Announcement, police officers who served as Deputy Police Chief or captain were eligible for a promotion to the position of Chief of Police. (*Id.* ¶ 51.) Both Plaintiff and Rabboh were eligible to apply. (*Id.* ¶ 52.) Rabboh was not required to submit a formal application to be considered for the Chief position. (*Id.* ¶ 53.)

### D. Chief of Police Interviews

The Chief of Police interviews were held on August 6, 2019 in a closed executive session of the Bergenfield Mayor and Council. (*Id.* ¶ 57.) The following individuals attended the interviews: former mayor Norman Schmelz, former council president and current councilmember Ora Kornbluth, councilmember Thomas Lodato, councilmember Buddy Deauna, councilmember and current mayor Arvin Amatorio, councilmember Hernando Rivera, councilmember Rafael Marte, Borough Administrator Corey Gallo, and Deputy Borough Clerk Hilda Tavitian. (*Id.* ¶ 58.)

In preparation for the Chief of Police interview, Rabboh contacted Madalone and requested a copy of a five-year plan she submitted when she interviewed for the Chief of Police position. (*Id.* ¶ 54.) She provided the plan to Rabboh via email. (*Id.*) Madalone also sent her five-year plan to Plaintiff, but Plaintiff did not "read it heartily." (*Id.* ¶ 55.) Defendants assert that in preparation for

5

**JA022**

the interview, Rabboh created his own five-year plan based on his own thoughts and ideas for the BPD, despite not being asked or required to submit one. (*Id.* ¶ 56.) Plaintiff disputes this notion and asserts that Rabboh's five-year plan mirrored Madalone's. (PCSMF ¶ 56.)

During his interview, Rabboh submitted his five-year plan to the mayor, counsel, and others present. (DSMF ¶ 59.) Those present at the interview asked Rabboh various question. (*Id.* ¶ 60.) When asked why he was more qualified than Plaintiff for the Chief position, Rabboh responded that he was there to tell interviewers what he brought to the table, and he would let other candidates speak for themselves. (*Id.* ¶ 61.) Rabboh discussed his strengths, including his social media involvement, tenure as the public information officer, community orientation, experience running the Youth Academy, and his desire to form a closer relationship between the Bergenfield community and the BPD. (*Id.* ¶ 63.) While Defendants assert that this focus on community interaction and outreach "caught the attention of some councilmembers[,]" Plaintiff asserts that this was not the case as some councilmembers found Rabboh's statements on this to be "a general description" or did not remember that aspect of his interview. (DSMF ¶ 64; PCSMF ¶ 64.) Defendants assert that Plaintiff did not discuss community interaction during his interview, but Plaintiff again disputes this assertion. (DSMF ¶ 64; PCSMF ¶ 64.) Plaintiff and Rabboh were asked similar questions during their interviews. (DSMF ¶ 70.) Plaintiff believed the interview process was a sham. (*Id.* ¶ 72.)

### E. The Vote for Chief

In Bergenfield, four councilmembers constitute a majority for voting purposes.[7] (*Id.* ¶ 78.) At the August 6, 2019 closed session meeting of the Council, councilmembers Marte, Deauna,

---

[7] Former Mayor Schmeltz was not eligible to vote unless there was a tie amongst the councilmembers. (DSMF ¶ 75.) Borough Administrator Gallo did not have the authority to promote anyone, including Plaintiff, to Chief as such decision was required to be voted on by Council at a regular open meeting. (*Id.* ¶ 76.) Defendants assert that Gallo did not recommend anyone for the Chief position. (*Id.* ¶ 77.) Plaintiff specifically denies this asserted fact, and instead

6

Amatorio, and Rivera stated their support for Rabboh for Chief, while Kornbluth and Lodato supported Plaintiff. (*Id.* ¶ 79.) On August 20, 2019, at the Bergenfield Regular Mayor and Council Meeting ("August 20 Meeting"), the Council took an official vote and named Rabboh Chief. (*Id.* ¶ 82.) Defendants assert Kornbluth changed her support from Plaintiff to Rabboh at this meeting. (*Id.* ¶ 81.) Plaintiff challenges this assertion, stating that Kornbluth did not have a choice but to change her vote to Rabboh because "[t]he vote was for Rabboh or no one else[.]" (PCSMF ¶ 81.)

Defendants state that at no time during the August 20 Meeting was it stated or implied that race was a motivating, influential, or deciding factor in promoting Rabboh to Chief of Police. (DSMF ¶ 83.) Plaintiff disputes this assertion and cites to the minutes from the August 20 Meeting, in which councilmembers made comments regarding the value of diversity, the diversity of Bergenfield, and the American Dream. (PCSMF ¶ 83.) Defendants assert that Bergenfield councilmembers and employees agreed race was not considered when promoting Rabboh to Chief. (DSMF ¶ 88.) Plaintiff denies this assertion and cites to testimony from Defendant Deauna in which Deauna stated Rabboh was better suited for Chief because he was more "energetic" and because "he's a minority." (PCSMF ¶ 83.)

During the relevant period, BPD retained a Recruitment/Equal Employment Opportunity General Order, which included an Affirmative Action Policy Statement. (DSMF ¶ 84.) The Affirmative Action Policy Statement provides: "Base decisions on employment so as to further the principal of equal employment opportunity and appropriate community representation while following the guidelines of the New Jersey Civil Service Commission." (*Id.* ¶ 84.) Plaintiff admits the BPD Order included the Affirmative Action Policy Statement, but he denies this is a material fact because the Affirmative Action Policy applies to hiring, not promotions. (PCSMF ¶¶ 84-85.)

---

asserts that Gallo recommended that Plaintiff be made Chief based on Gallo's strong working relationship with Plaintiff. (PCSMF ¶ 77.)

**JA024**

In his Supplemental Statement of Undisputed Material Facts, Plaintiff describes other statements made by Defendants at the August 20 Meeting. Defendant Marte stated that "Bergenfield is a safe and friendly town, but no one has named the one thing that makes it the best town to raise a family, which is the diversity." (Supp. SMF ¶ 154.) Defendant Marte also said that "Bergenfield appointed the first female Police Chief in 2015, and now has appointed the first Muslim Chief in 2015, and second in the State of New Jersey." (*Id.* ¶ 155.) Defendant Deauna stated that "the make-up of the Council is diversified, and we [were] able to achieve the American Dream." (*Id.* ¶ 156.) Defendant Amatorio also stated that Rabboh "expressed that he lives the American dream[]" and that "it was good to hear because many of the people in the audience, and even on the Council, share the same vision, experience and passion." (*Id.* ¶ 157.) Defendant Amatorio also stated that "this is a diverse town, audience, council, and we are proud to have you (Rabboh) as the next Chief of the Police Department." (*Id.* ¶ 158.) Defendant Rivera stated that he felt he "did the right thing" in voting for Rabboh, he was "proud[,]" and he hoped to "continue doing the right thing for the diverse community of Bergenfield." (*Id.* ¶ 158.) Plaintiff also states that Defendant Amatorio is Filipino (*id.* ¶ 13), Defendant Rivera is Colombian (*id.* ¶ 15), Defendant Deauna is Filipino (*id.* ¶ 17), and Defendant Marte is Dominican (*id.* ¶ 19).

Plaintiff's Complaint asserts three counts: Count 1: violation of 42 U.S.C. § 1983 based on violations of the equal protection clause (Compl. ¶¶ 32-34); Count 2: violation of the New Jersey Law Against Discrimination (*id.* ¶¶ 35-38); and Count 3: violation of 42 U.S.C. § 1981 based on alleged race discrimination. (*Id.* ¶¶ 39-41.) Defendants move for summary judgment on all three counts.

**JA025**

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted if the movant shows that "there is no genuine issue as to any material fact [and] the moving party is entitled to a judgment as a matter of law." *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an

affidavit."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23). Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.

## III.   ANALYSIS

### A.  Section 1983

Although Plaintiff's Complaint states that his Section 1983 claim is based on an equal protection violation, Defendants analyze Plaintiff's Section 1983 claim using a procedural due process standard. (Def. Br. at 5-9.) In his opposition brief, Plaintiff argues his Section 1983 claim is grounded in an equal protection violation based on Defendants' failure to promote Plaintiff due to reverse race discrimination. (Opp. at 3-5.) However, Plaintiff's analysis is based on the standard for Title VII reverse race discrimination claims. (*Id.*) Plaintiff asserts that failure to promote claims based on reverse race discrimination may be brought pursuant to Section 1983 or Title VII. (*Id.* at 4.) Nevertheless, the Third Circuit has expressly stated that such employment-related claims for race discrimination may not be brought pursuant to Section 1983. *Williams v. Pa. Human Rels. Comm'n*, 870 F.3d 294, 299 (3d Cir. 2017) ("Allowing pure Title VII and ADA claims under § 1983 would thwart Congress's carefully crafted administrative scheme by throwing open a back door to the federal courthouse when the front door is purposefully fortified."). Accordingly, summary judgment is granted in Defendants' favor on Count 1.

10

JA027

### B.  Section 1981

Defendants argue that Plaintiff's Section 1981 claim must be dismissed because there is no private right of action under Section 1981. (Def. Br. at 15-16.) The Court agrees. The Third Circuit has held that "no implied private right of action exists against state actors under 42 U.S.C. § 1981." *McGovern v. City of Phila.*, 554 F.3d 114, 122 (3d Cir. 2009). Accordingly, summary judgment is granted in Defendants' favor on Count 3.

### C.  NJLAD

Defendants likewise move for summary judgment on Plaintiff's NJLAD claim. To establish a prima facie case for failure to promote under the NJLAD, a plaintiff generally must show: "(1) that [he] is a member of a class protected by the anti-discrimination law; (2) that [he] was qualified for the position or rank sought; (3) that [he] was denied promotion, reappointment, or tenure; and (4) that others . . . with similar or lesser qualifications achieved the rank or position." *Glenn v. Lawrence Twp. Police Dep't*, No. 10-3121, 2012 U.S. Dist. LEXIS 37241, at *15 (D.N.J. Mar. 19, 2012) (alterations in original) (quoting *Dixon v. Rutgers, The State Univ. of N.J.*, 541 A.2d 1046, 1051-52 (N.J. 1988)).

However, in cases involving reverse race discrimination, an employee must demonstrate "he has been victimized by an 'unusual employer who discriminates against the majority.'" *Ditzel v. Univ. of Med. & Dentistry*, 962 F. Supp. 595, 603 (D.N.J. 1997) (quoting *Erickson v. Marsh & McLennan Co.*, 569 A.2d 793, 799 (N.J. 1990) (quoting *Livingston v. Roadway Express*, 802 F.2d 1250, 1252 (10th Cir. 1986))). Unlawful discrimination under the NJLAD "may be proven by either direct or circumstantial evidence." *A.D.P. v. ExxonMobil Research & Eng'g Co.*, 54 A.3d 813, 821 (N.J. Super. Ct. App. Div. 2012). Direct evidence of discrimination is evidence "that an employer placed substantial reliance on a proscribed discriminatory factor in making its decision

11

**JA028**

to take the adverse employment action[.]" *McDevitt v. Bill Good Builders, Inc.*, 816 A.2d 164, 168 (N.J. 2003). "The evidence produced must, if true, demonstrate not only a hostility toward members of the employee's class, but also a direct causal connection between that hostility and the challenged employment decision." *Bergen Com. Bank v. Sisler*, 723 A.2d 944, 954 (N.J. 1999). Here, Plaintiff has not set forth any direct evidence of discrimination. Accordingly, Plaintiff must establish unlawful discrimination through circumstantial evidence.

When relying on circumstantial evidence, a plaintiff must present "background circumstances" suggesting that defendants engaged in discrimination. *See Devito v. Bd. of Educ.*, 29 F. App'x 886, 889 (3d Cir. 2002). To support his allegations that Defendants engaged in discrimination, Plaintiff asserts that the Defendants who voted for Rabboh and Rabboh himself are all racial minorities. (Opp. at 6.) However, standing alone, the minority status of individuals who grant or receive preferential employment treatment is not enough to establish background circumstances suggesting discrimination. *Devito*, 29 F. App'x at 889. Plaintiff also asserts that some of Defendants' statements about Rabboh's minority status constitute evidence of discrimination. (Opp. at 7-8.) Furthermore, Plaintiff argues that Defendants' speeches at the August 20 Meeting were centered on Rabboh's race and religion. (Opp. at 9.) In *Wachstein v. Slocum*, the New Jersey Appellate Division explained that "[i]f an employer's statements that he planned to combat discrimination and to pursue affirmative action goals were held to be an adequate basis for a finding of discrimination against a white employee, anti-discrimination laws would be turned on their head and transformed into a device for preservation of the racial status quo in the workforce." 625 A.2d 527, 533 (N.J. Super. Ct. App. Div. 1993). Similarly here, Defendants' statements about Rabboh's minority status, the American Dream, and the value of diversity do not form an adequate basis to establish background circumstances suggesting Defendants engaged in racial

12

**JA029**

discrimination against Plaintiff. Accordingly, Plaintiff has not established background circumstances to support a prima facie case of reverse race discrimination.

Even if Plaintiff established a prima facie case, his claim would still fail. If a plaintiff establishes a prima facie reverse race discrimination case, the burden of production shifts to the defendant, who must articulate a legitimate, non-discriminatory reason for his or her actions. *Ditzel*, 962 F. Supp. at 603. This burden of production is satisfied if the defendant introduces evidence that, if taken as true, permits a "conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).[8] Here, Defendants proffer several reasons for why they hired Rabboh, including his experience, history of community engagement and outreach, five-year plan, and other strengths as a candidate. (*See, e.g.*, DSMF ¶¶ 62-63.) These reasons are sufficient to satisfy Defendants' burden of production.

Accordingly, summary judgment is granted in Defendants' favor on Count 2.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (ECF 110) is **GRANTED**. An appropriate order follows.

*/s/ Jamel K. Semper*
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig:    Clerk
cc:      José R. Almonte, U.S.M.J.
         Parties

---

[8] Thereafter, the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the defendant's purported nondiscriminatory reason was merely a pretext for discrimination. *Zive v. Stanley Roberts, Inc.*, 867 A.2d 1133, 1139 (N.J. 2005). "This is satisfied if a plaintiff can show that '(1) a discriminatory reason more likely motivated the employer than the employer's proffered legitimate reason, or (2) the defendant's proffered explanation is "unworthy of credence."'" *Glenn*, 2012 U.S. Dist. LEXIS 37241, at *17 (quoting *Maiorino v. Schering-Plough Corp.*, 695 A.2d 353, 365 (N.J. Super. Ct. App. Div. 1997) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981))). Plaintiff has not shown that Defendants' proffered reasons are merely a pretext for discrimination.

13

**JA030**

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

CHRISTOPHER MASSEY,

       Plaintiff,

v.

BOROUGH OF BERGENFIELD, ARVIN
AMATORIO, HERNANDEZ RIVERA,
ORA KORNBLUTH, RAFAEL MARTE,
AND BUDDY DEAUNA,

       Defendants.

Civil Action No. 20-01942

**ORDER**

September 11, 2024

**SEMPER**, District Judge.

       **THIS MATTER** comes before the Court on Defendants Borough of Bergenfield, Arvin Amatorio, Hernandez Rivera, Ora Kornbluth, Rafael Marte, and Buddy Deauna's (collectively "Defendants") motion for summary judgment. (ECF 110.) Plaintiff Christopher Massey ("Plaintiff" or "Massey") filed a brief in opposition to the motion. (ECF 114.) Defendants filed a reply brief. (ECF 116.) The Court reviewed the parties' submissions and decided the motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth in this Court's September 11, 2024 opinion,

       **IT IS** on this 11th day of September 2024,

       **ORDERED** that Defendants' motion for summary judgment is **GRANTED**, and the matter shall be marked **CLOSED**.

       **SO ORDERED.**

_/s/ Jamel K. Semper_

**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig:   Clerk
cc:     José R. Almonte, U.S.M.J.
        Parties

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 31, 2025, I electronically filed Joint Appendices Volumes I-III using the appellate CM/ECF system. I also caused copies of the Joint Appendices to be served electronically on the following counsel for Defendants-Appellees:

John L. Shahdanian, Esquire
Trenk Isabel Siddiqi & Shahdanian P.C.
Court Plaza South, West Wing
21 Main Street, Suite 251
Hackensack, NJ 07601


*/s/ Dylan T. Hastings*
Dylan T. Hastings