# U.S. COURT OF APPEALS
# FOR THE THIRD CIRCUIT

No. 24-2761

CHRISTOPHER G. MASSEY,
APPELLANT

v.

BOROUGH OF BERGENFIELD; ARVIN AMATORIO;
HERNANDEZ RIVERA; ORA KORNBLUTH; RAFAEL MARTE;
BUDDY DEAUNA

―――――――――――――――――

Appeal from the U.S. District Court, D.N.J.
Judge Jamel K. Semper, No. 2:20-cv-01942

Before: CHAGARES, *Chief Judge*, BOVE and SCIRICA,
*Circuit Judges*
Argued Oct. 27, 2025; Decided Mar. 6, 2026

―――――――――――――――――

OPINION OF THE COURT

BOVE, *Circuit Judge*.  Plaintiff Christopher Massey is a white male who served for decades in the Borough of Bergenfield's Police Department.  He rose to the rank of Deputy Chief and was acting as the Department's Officer In Charge in mid-2019.  Around that time, the Borough denied Plaintiff a promotion to the Chief position in favor of Mustafa Rabboh, an Arab-Muslim male with the rank of Captain.  In response, Plaintiff brought discrimination claims under state

and federal law against Bergenfield and the five members of Bergenfield's Council who voted for Rabboh. Following discovery, the District Court granted Defendants' summary judgment motion in its entirety.

Central to this case is the heightened burden foisted upon Plaintiff under New Jersey law, which is known as the "Background Circumstances Rule." Derived from abrogated opinions by federal courts other than our own, New Jersey's version of the Rule requires a plaintiff who is not in the "minority" to "show that he has been victimized by an unusual employer who discriminates against the majority." *Erickson v. Marsh & McLennan Co.*, 569 A.2d 793, 799 (N.J. 1990).[1]

In a decision issued after this appeal was fully briefed, the U.S. Supreme Court unanimously struck down the Background Circumstances Rule for purposes of litigation under Title VII of the Civil Rights Act of 1964. *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303 (2025). When a federal court is asked to pass upon an unresolved state-law matter, our task is to predict how the highest court of that state would decide the relevant legal issue. That is our job in this case. Although the Supreme Court of New Jersey has not yet had occasion to address *Ames*, we predict that the court would rely on *Ames* to conclude that the State's Background Circumstances Rule no longer has a permissible role to play in litigation under New Jersey's Law Against Discrimination (NJLAD). The Rule is incompatible with the operative text of the NJLAD, which is identical to the pertinent language from Title VII. Both statutes extend protections to "any"—and,

---

[1] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, alterations, and subsequent history.

therefore, all—individuals.  The language applies regardless of supposed membership in a majority or minority group.  These considerations are reinforced by the fact that the Rule's vagueness leaves it susceptible to arbitrary applications and inconsistent results, as we pointed out when we rejected the federal version long ago.  *See Iadimarco v. Runyon*, 190 F.3d 151, 158-59 (3d Cir. 1999).

After removing the Background Circumstances Rule from the equation, and upon *de novo* review of Defendants' summary judgment motion, there are genuine disputes concerning material facts that arise from Plaintiff's direct and circumstantial evidence of discrimination.  Defendants conceded in their summary judgment motion that they "considered Rabboh's race" when deciding on the promotion.  JA 79.  Plaintiff testified that Bergenfield's Borough Administrator told him the decision was "all about race."  JA 475.  Based on this evidence, and more, Plaintiff was entitled to a trial.  Accordingly, we will reverse in part, affirm in part, and remand for proceedings consistent with this opinion.

## I.

We summarize the dense record and procedural history of the matter, drawing all reasonable inferences in Plaintiff's favor.  *See, e.g.*, *Jorjani v. N.J. Inst. of Tech.*, 151 F.4th 135, 140 n.5 (3d Cir. 2025).

## A.

The Borough of Bergenfield has a Mayor, a Borough Administrator, a six-member Council, and a Police Department with over 40 officers.  Department promotions—including the

promotion to Chief of Police—are decided by a majority vote of the Council.  The Mayor breaks any ties.

The Council consists of six elected individuals.  During the relevant period, the Councilmembers were Arvin Amatorio, Hernando Rivera, Buddy Deauna, Rafael Marte, Ora Kornbluth, and Thomas Lodato.  Defendants are Bergenfield and the five Councilmembers who voted against Plaintiff's promotion in 2019: Amatorio, Deauna, Kornbluth, Marte, and Rivera.  For simplicity's sake, although some Defendants and other relevant individuals have changed roles since the operative events, we use job titles in this opinion to refer to the people who held those roles in 2019.

Plaintiff is a white male who began his service at the Bergenfield Police Department in 1995.  Mustafa Rabboh, who received the promotion at issue, is described in the record as an "Arab," or "Palestinian," of Muslim faith.  *See, e.g.*, JA 2, 392, 415, 475.  He joined the Department via a lateral transfer eight years later in 2003.  Although Rabboh eventually obtained the rank of Captain, he was also the subject of seven complaints to the Department's Internal Affairs Bureau and received a four-day disciplinary suspension based on one of those complaints.

Between 2003 and 2015, Plaintiff obtained promotions through the ranks of Sergeant, Lieutenant, and Captain.  In 2015, Bergenfield's Council voted to promote Cathy Madalone to be the Chief of the Department instead of Plaintiff.  Following that decision, the Council made Plaintiff the Department's Deputy Chief.  In that role, Plaintiff was responsible for "three-quarters to 90 percent of the department on a day-to-day basis."  JA 451.  In February 2019, when Madalone had to miss work for medical reasons, she named Plaintiff the Department's Officer In Charge.  Madalone

announced her retirement months later, and Plaintiff continued to act as the Department's Officer In Charge while the Council searched for Madalone's replacement.

At a meeting of the Council's Police Committee on June 6, 2019, the Borough Administrator informed Plaintiff and Rabboh that the Council would interview both of them for the Chief position. The Mayor and Defendants Amatorio, Rivera, and Kornbluth were present at the meeting. During the meeting, Defendant Rivera asked Plaintiff to identify officer candidates that the Department was considering hiring at the time, including their genders and what the candidates "look[ed] like." JA 460. The Mayor understood that Defendant Rivera asked the question because he wanted to help a female associate get the job instead. After Plaintiff resisted, Defendant Rivera told Plaintiff that he did not "look like the people in the town." JA 460.

On August 6, 2019, the Mayor, the Borough Administrator, and the Council interviewed Plaintiff and Rabboh for the Chief position in a closed executive session. The individual Defendants were "playing on their phones" during Plaintiff's interview. JA 473. Defendant Marte arrived approximately 30 minutes late. In an informal vote following the interviews, Defendants Amatorio, Deauna, Marte, and Rivera voted for Rabboh. Toward the end of the closed session, Councilman Lodato expressed concern about the decision and predicted that the Council's choice was "definitely going to cause a lawsuit." JA 694. The meeting minutes are less colorful. According to that document, the Mayor and the Council "agreed that the two candidates are very qualified for the position" and "great," but that Rabboh "is the better candidate for the position." JA 297.

Following the informal vote, the Borough Administrator told Plaintiff that the Council "screwed over" Plaintiff by promoting Rabboh. JA 704. The Borough Administrator indicated that the Council's decision was "all about race." JA 475. During a deposition, Defendant Marte agreed that it was "important to have a minority department head" in Bergenfield. JA 601. Defendant Deauna testified that he believed Rabboh would be a better Chief, in part, because "he's a minority." JA 611.

On August 20, 2019, the Council convened public proceedings to formally vote Rabboh in as Chief of the Department. The Mayor, Borough Administrator, and all six members of the Council were present, though Councilman Lodato arrived approximately 45 minutes late. At the meeting, Defendant Kornbluth joined Defendants Amatorio, Deauna, Marte, and Rivera in voting to promote Rabboh.

Defendants contend that their votes were based on non-discriminatory considerations, including the candidates' qualifications, interview performance, and strategic planning as well as asserted interests in continuity for the Chief position and diversity. There is no dispute that diversity was a significant feature of remarks by public officials when Rabboh was sworn in. According to the minutes, while praising Rabboh, Defendant Amatorio noted that "[t]his is a diverse town, audience, [and] council." JA 337. Defendant Deauna stated that Rabboh would bring "understanding of the diversified community" of Bergenfield to his new role. JA 337. Defendant Marte emphasized that "Bergenfield appointed the first female Police Chief in 2015, and now has appointed the first Muslim Police Chief, only the second in the State of New Jersey." JA 337. Defendant Rivera told the

group that he hoped to "continue doing the right thing for the diverse community in Bergenfield."  JA 337.

## B.

In February 2020, Plaintiff filed three claims alleging racial and religious discrimination in violation of the NJLAD, N.J. Stat. Ann. § 10:5-12(a); 42 U.S.C. § 1983 and the Equal Protection Clause; and 42 U.S.C. § 1981.

Following discovery and a period of unsuccessful settlement discussions, Defendants moved for summary judgment in December 2023.  The District Court granted the motion in September 2024.  With respect to Plaintiff's NJLAD claim, the District Court found that Plaintiff had not met the requirements of the Background Circumstances Rule.  The court also concluded that Plaintiff had failed to adequately rebut Defendants' justifications for their promotion decision. The court granted summary judgment on Plaintiff's § 1983 claim by reasoning that employment-related claims for race discrimination cannot be brought under that statute.  The court granted summary judgment on the § 1981 claim because the statute does not provide for a private cause of action.

## II.

The District Court had jurisdiction under 28 U.S.C. § 1331.  We have jurisdiction under 28 U.S.C. § 1291.

We review a District Court's grant of summary judgment *de novo*.  *Jorjani*, 151 F.4th at 140 n.5.  A summary judgment movant must establish either of two "closely related" scenarios.  *Mall Chevrolet, Inc. v. Gen. Motors LLC*, 99 F.4th 622, 630 (3d Cir. 2024).  "[U]nder the standard approach, the

moving party may produce material facts, established as genuinely undisputed, that entitle it to judgment as a matter of law." *Id.* Alternatively, the movant "may instead demonstrate that the nonmoving party has not made a showing sufficient to establish the existence of an element essential to that party's case . . . *on which that party will bear the burden of proof at trial.*" *Id.*; *see also Parker v. N.J. Motor Vehicle Comm'n*, 158 F.4th 470, 478 (3d Cir. 2025).

## III.

Plaintiff is entitled to a trial on his NJLAD claim. The principal driver of that outcome is *Ames*. Whereas the District Court faithfully applied binding pre-*Ames* authorities relating to the NJLAD, we must address the implications of the U.S. Supreme Court's intervening analysis of identical language from Title VII. We predict that the Supreme Court of New Jersey would rely on *Ames* to put an end to New Jersey's version of the Background Circumstances Rule. Based on that holding, there are factual disputes on material issues that must be resolved at trial. Accordingly, we will reverse the District Court's summary judgment ruling on Plaintiff's NJLAD claim.

## A.

We start by setting the scene. Since the 1970s, New Jersey has applied the three-step *McDonnell Douglas* framework to NJLAD claims. In 1990, the Supreme Court of New Jersey adopted other federal courts' version of the Background Circumstances Rule. In 1999, we declined to adopt the Rule for purposes of Title VII. Things went quiet on this front for a while. At least in the Third Circuit and New Jersey. Then, last summer in *Ames*, the Supreme Court

rejected the Title VII version of the Rule. Here are the relevant details:

New Jersey courts started to apply the *McDonnell Douglas* framework in 1978. *Peper v. Princeton Univ. Bd. of Trs.*, 389 A.2d 465, 479 (N.J. 1978) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-06 (1973)). In *Erickson v. Marsh & McLennan Co.*, the Supreme Court of New Jersey followed federal law from outside this Circuit and adopted the Background Circumstances Rule as the standard for a *prima facie* case in NJLAD "reverse-discrimination" claims. 569 A.2d at 799. The Rule "modified the first prong of the *McDonnell Douglas* standard to require the plaintiff to show that he has been victimized by an unusual employer who discriminates against the majority." *Id.* The *Erickson* court explained that New Jersey's Rule is "derived from its federal counterpart," and "agree[d]" with a decision of New Jersey's Appellate Division adopting the Sixth Circuit's then-existing version of the Rule. *Id.* (citing *Murray v. Thistledown Racing Club Inc.*, 770 F.2d 63, 67 (6th Cir. 1985)). As additional support, the Supreme Court of New Jersey cited five additional federal decisions applying the Background Circumstances Rule in Title VII cases. *Id.*

Almost 10 years after *Erickson*, we departed from several other Circuits and declined to "cram" the Background Circumstances Rule into Title VII. *Iadimarco*, 190 F.3d at 158. We found the Rule "problematic and unnecessary," in part because it "raise[d] the bar" for "reverse-discrimination" plaintiffs in a manner that is inconsistent with the text of Title VII as interpreted by the Supreme Court. *Id.* at 159, 161.

In *Ames*, the U.S. Supreme Court rejected the federal version of the Background Circumstances Rule. The *Ames*

Court unanimously held that the Rule "is not consistent with Title VII's text or our case law construing the statute." 605 U.S. at 306. The statutory text "draws no distinctions between majority-group plaintiffs and minority-group plaintiffs." *Id.* at 309. Thus, "the standard for proving disparate treatment under Title VII does not vary based on whether or not the plaintiff is a member of a majority group." *Id.* at 310. The Rule also "ignores" the U.S. Supreme Court's "instruction to avoid inflexible applications of *McDonnell Douglas*'s first prong" by "uniformly subjecting all majority-group plaintiffs to the same, highly specific evidentiary standard in *every* case." *Id.* at 310-11.

## B.

The question, then, is whether New Jersey's Background Circumstances Rule is still viable after *Ames*. The Supreme Court of New Jersey has not had an opportunity to weigh in. New Jersey's intermediate appellate courts and trial courts have not been free to do so because of *Erickson*. *See State v. DeRosa*, 2019 WL 2869611, at *6 (N.J. App. Div. 2019). So we are left to perform the "delicate task" of predicting how the Supreme Court of New Jersey "would interpret and apply the [NJLAD] in the aftermath" of the Supreme Court's recent decision. *McKenna v. Pac. Rail Serv.*, 32 F.3d 820, 825 (3d Cir. 1994). Based on New Jersey's interpretative methodology and the operative text of the NJLAD, we predict that the Supreme Court of New Jersey would jettison the state-law version of the Rule.

When considering how the Supreme Court of New Jersey would react to *Ames*, we are mindful that the court has "looked to federal law as a key source of interpretive authority." *Grigoletti v. Ortho Pharm. Corp.*, 570 A.2d 903,

906 (N.J. 1990). Based on that practice we predict, similar to our predictions in other cases, that the Supreme Court of New Jersey would find the analysis in *Ames* compelling when interpreting the NJLAD. *See Taxman v. Bd. of Educ. of Twp. of Piscataway*, 91 F.3d 1547, 1565 (3d Cir. 1996) (en banc) ("[W]e predict that the New Jersey Supreme Court would follow the analytical directive of [the Supreme Court in] *Weber* and *Johnson*."); *see also Zanetich v. Wal-Mart Stores E., Inc.*, 123 F.4th 128, 141 (3d Cir. 2024) (reasoning that a "predictive judgment is informed, in part, by federal caselaw"); *Tatarunas v. Progressive Cas. Ins. Co.*, 2025 WL 2673991, ¶¶ 28-29 (Ohio App. 8th 2025) (finding that *Ames* abrogated state-law Background Circumstances Rule).

This follows from the fact that both courts apply the same "[b]asic techniques of statutory interpretation." *New Jersey v. Grate*, 106 A.3d 466, 473 (N.J. 2015). Plain meaning of unambiguous statutory text controls. *See, e.g.*, *Crisitello v. St. Theresa Sch.*, 299 A.3d 781, 792 (N.J. 2023). The pertinent text from Title VII and the NJLAD is identical. Both statutes prohibit discrimination against "any" person. 42 U.S.C. § 2000e-2(a)(1); N.J. Stat. Ann. § 10:5-12(a). The Supreme Court of New Jersey "has been scrupulous in its insistence that the Law Against Discrimination be applied to the full extent of its facial coverage." *Nini v. Mercer Cnty. Cmty. Coll.*, 995 A.2d 1094, 1100 (N.J. 2010). The facial coverage of the NJLAD leaves no room for the Background Circumstances Rule.

When making *Erie* predictions, we also consider the "policy of the statute" as articulated by a state's legislature and apex court. *Wayne Moving & Storage of New Jersey, Inc. v. Sch. Dist. of Philadelphia*, 625 F.3d 148, 155 (3d Cir. 2010). The Supreme Court of New Jersey has repeatedly explained

that the NJLAD "ban[s] employment discrimination" and seeks to achieve "nothing less than the eradication of the cancer of discrimination in the workplace." *Bergen Com. Bank v. Sisler*, 723 A.2d 944, 949 (N.J. 1999). Banning and eradication are absolute, categorical terms reflecting resolve and focused intention to eliminating discrimination. And "[e]liminating racial discrimination means eliminating all of it." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023). In Title VII, "Congress left no room for courts to impose special requirements on majority-group plaintiffs alone." *Ames*, 605 U.S. at 310. New Jersey's legislature did the same thing by adopting language that is, as relevant here, a mirror image.

Finally, we find it relevant that the Supreme Court of New Jersey has on other occasions looked to the "federal experience" to "assure some reasonable degree of symmetry and uniformity." *Grigoletti*, 570 A.2d at 912. Since *Erickson* was decided in 1990, the federal experience with the Background Circumstances Rule was hardly positive. In *Iadimarco*, with the benefit of more data, we observed that "application and interpretation" of the Rule had already "proven difficult." 190 F.3d at 160. We characterized the Rule as "problematic," "irremediably vague," "amorphous," "ill-defined," and "unnecessary." *Id.* at 161, 163.

For all of these reasons, we are confident that the Supreme Court of New Jersey would once again conclude that "it is in the best interests of everyone concerned to have some uniformity in the law" and thus interpret the identical text in the NJLAD in the same manner that the U.S. Supreme Court interpreted Title VII. *Peper*, 389 A.2d at 478. We therefore predict that the Supreme Court of New Jersey would strike

down the Background Circumstances Rule much in the same way that the *Ames* Court did.

## C.

We now turn to the record.  The parties agreed that the *McDonnell Douglas* framework applied to Defendants' motion for summary judgment.  The District Court obliged.

*McDonnell Douglas* is an "evidentiary edifice constructed by the Supreme Court." *Marzano v. Comput. Sci. Corp. Inc.*, 91 F.3d 497, 510 (3d Cir. 1996).  "[C]onfusion arises" when "attempting to apply the *McDonnell Douglas* burden-shifting framework" in "reverse discrimination" cases. *Iadimarco*, 190 F.3d at 158.  As a result, we do not envy the District Court's assignment, and our conclusions below in no way question the court's characteristically thoughtful approach to the job at hand.

## 1.

Setting aside the Background Circumstances Rule, as we must, the *prima facie* case for an NJLAD failure-to-promote claim has three requirements: (1) the plaintiff was qualified for the promotion; (2) he was denied the promotion; and (3) the position was awarded to an applicant with similar or lesser qualifications.  *See, e.g.*, *Andersen v. Exxon Co., U.S.A.*, 446 A.2d 486, 490-91 (N.J. 1982); *see also Iadimarco*, 190 F.3d at 161 (reasoning that "all that should be required" in a "reverse-discrimination" case is "sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected").  At summary judgment, this is at most a "slight" evidentiary burden. *Zive v. Stanley Roberts, Inc.*, 867 A.2d

1133, 1139 (N.J. 2005). The *prima facie* burden is "no longer relevant" after defendants seek to articulate non-discriminatory reasons for an employment action. *See Hopp v. City of Pittsburgh*, 194 F.3d 434, 439 (3d Cir. 1999) (Alito, J.).

Defendants acknowledge that Plaintiff "was a qualified candidate for the position of Chief." Br. 14. He was a white male who served the Department since 1995 and ascended to the roles of Deputy Chief and Officer In Charge. Some in Bergenfield's leadership supported Plaintiff's pursuit of the Chief promotion when the job was previously vacant in 2015.

It is "certainly relevant," though not by itself sufficient, that the five individual Defendants who voted to promote Rabboh are members of minority groups. *Iadimarco*, 190 F.3d at 156. Defendants conceded in their summary judgment motion that they "considered Rabboh's race and religion" when making that decision. JA 79. After participating in the interviews with the Council, the Mayor believed that Plaintiff's resume was "overwhelmingly better," Rabboh was "definitely under-qualified," and the selection process was not "fair." JA 712-13, 730. Councilman Lodato testified that he was "sure" Plaintiff was "more qualified" than Rabboh. JA 641. Lodato believed the Council's decision was "wrong." JA 641, 713.

Defendants' main response is that Rabboh was also qualified. That is not for us to decide and—even if true, which it may well be—not sufficient to defeat Plaintiff's *prima facie* showing. "[O]nly the plaintiff's evidence should be considered." *Zive*, 867 A.2d at 1144. We have recited here some examples of the types of evidence that Plaintiff obtained during discovery to support the inference that "discrimination *could* be a reason for the employer's action." *Id.* at 1139. It

will be up to a jury to sort that out, but nothing more was required of Plaintiff at the *prima facie* stage.

**2.**

By making a *prima facie* showing of discrimination, Plaintiff earned "the right, as in a poker game, to require the employer to show its hand—that is, to offer an explanation other than discrimination why the employee suffered an adverse employment action." *Marzano*, 91 F.3d at 508.

Defendants proffered several overlapping justifications for the decision to promote Rabboh, which fit into five categories: (a) qualifications; (b) interview performance; (c) long-term strategy; (d) continuity; and (e) diversity. To defeat the summary judgment motion, Plaintiff had to come forward with evidence sufficient to establish a reasonable inference that Defendants' justifications were pretextual. *See Sisler*, 723 A.2d at 955. Because "we may not require affirmative evidence of discrimination in addition to proof of pretext," Plaintiff had two options. *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005). The evidence had to permit a factfinder to reasonably "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Zive*, 867 A.2d at 1144 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). Plaintiff did both. He met his burden of putting forth evidence that Defendants' justifications were false, as discussed immediately below, and that discrimination was a motivating factor in the decision, as discussed in the next section.

**a.**

Defendants concede that Plaintiff was qualified for the promotion, but they contend that Rabboh was "legitimately qualified." Br. 19-20. Defendants cite Rabboh's rapid promotions during 16 years of service, exceptional scores on civil service examinations, and strategic vision for the job.

As noted in the analysis of Plaintiff's *prima facie* case, the Mayor and Councilman Lodato both testified in depositions that Plaintiff was more qualified than Rabboh. Their conclusion is consistent with, among other things, Rabboh's record of Internal Affairs complaints and discipline. An employer cannot prevail under *McDonnell Douglas* "merely by asserting that the responsible hiring official selected the man or woman who was the right person for the job." *Iadimarco*, 190 F.3d at 166. Defendants' similar justification is equally unpersuasive under the NJLAD.

**b.**

Defendants seek to justify Rabboh's promotion based on the quality of the candidates' interviews. The problem for Defendants is that Councilman Lodato did not recall "anything coming out in the interviews which would have persuaded anyone to vote against" Plaintiff. JA 642. In addition, Plaintiff testified that the participants in his interview were not attentive and "playing on their phones." JA 473. After the interview, the Borough Administrator told Plaintiff that he "crushed it" and "it's a slam dunk." JA 474. Plainly, there are material fact disputes with respect to this justification.

Defendants contend that Rabboh did a better job of positioning himself during the interview by discussing

community ties and a strategy of community policing. But Plaintiff testified that he, too, focused on "quality of life issues and the community policing" during his interview. JA 467. Plaintiff also described decades of meaningful engagement with the Bergenfield community during his deposition. Dating back to 2003, Plaintiff helped introduce police officers to students at four Bergenfield elementary schools before the students started to participate in the DARE Program. Around 2009, Plaintiff started to act as the liaison between the Department and all the schools in Bergenfield. After Plaintiff was promoted to Captain in 2012, he continued to act as a "hands-on guy with the schools." JA 448. Plaintiff regularly engaged with the Board of Education, and he provided strategic advice and counseling to administrators and teachers based on violent incidents at schools outside of New Jersey.

Collectively, this evidence established material factual disputes regarding the candidates' emphasis on the community during the interviews.

### c.

Defendants argue that their decision was also based on Rabboh's long-term strategy, including a written "Five-Year Plan" that he presented during his interview. Br. 3, 19. Councilman Lodato testified that Rabboh's Plan included "goals and objectives" that were "similar to the ideas" that Plaintiff "expressed verbally" during his interview. JA 639. There were also factual disputes regarding whether and to what extent Rabboh modified his Plan after obtaining the version that Madalone had used to obtain the Chief promotion in 2015. In addition to the evidence that Plaintiff and Rabboh addressed similar concepts and plans during their interviews, the

available inference of plagiarism by Rabboh supported Plaintiff's position regarding pretext.

### d.

Defendants argue that Rabboh was promoted because he had the "ability to provide long-term continuity to the BPD," *i.e.*, Plaintiff was eligible to retire before Rabboh. Br. 19. Viewing the evidence in the light most favorable to Plaintiff, the record does not sustain Defendants' argument that this was a differentiating characteristic.

Councilman Lodato testified that Plaintiff and Rabboh each "gave a similar commitment" to serve at least five years as Chief. JA 637. Plaintiff testified that he told the Council during his interview that he planned to work at the Department for "at least" five more years, and his preparatory notes from the meeting corroborated that testimony. JA 471. The Borough Administrator explained that Plaintiff "always said that he would work until 30" years of completed service to the Department—*i.e.*, until 2025, which was almost 5.5 years after the interview—and that Plaintiff was "pretty clear" about that with the Council. JA 697. Thus, there is evidence in the record that would permit a factfinder to reject Defendants' assertion that they promoted Rabboh based on concerns about continuity in the Chief position.

### e.

Defendants point to several considerations relating to diversity. Viewed individually or together, Plaintiff came forward with enough evidence to defeat summary judgment on these issues.

Counsel's naked invocation of a diversity preference is not a legitimate, non-discriminatory reason for an employment decision. *See, e.g.*, *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311 (2013) (confirming that "outright racial balancing" is "patently unconstitutional"); *Freeman v. Pitts*, 503 U.S. 467, 494 (1992) ("Racial balance is not to be achieved for its own sake."); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 274 (1986) ("This Court never has held that societal discrimination alone is sufficient to justify a racial classification."); *Lomack v. City of Newark*, 463 F.3d 303, 311 (3d Cir. 2006). Thus, the references in Defendants' briefing to "[c]elebrating diversity" and a general desire to "promote persons who represent [Bergenfield's] diversity" are insufficient on their own to justify the decision to promote Rabboh. Br. 16, 19.

It will be up to the jury to resolve the parties' dispute over the import of Defendants' evidentiary references to diversity, such as the comments at Rabboh's August 20, 2019 swearing-in ceremony. Depending on credibility, context, and other evidence, jurors could credit Defendants' statements as innocuous or consistent with a defensible policy aim—even though the comments are not, on their own, a lawful race-neutral justification for a challenged employment action. On the other hand, we cannot rule out that jurors will regard Defendants' uses of diversity terminology at Rabboh's swearing in as "code words" reflecting discriminatory intent. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 278 (3d Cir. 2001) ("[E]ven the use of 'code words' such as 'all of you' and 'one of them' could be sufficient evidence from which a jury could find an intent to discriminate."); *Price v. Valvoline, L.L.C.*, 88 F.4th 1062, 1068 (5th Cir. 2023) (Ho, J., concurring in the judgment); *Hill v. Ross*, 183 F.3d 586, 589 (7th Cir. 1999) (Easterbrook, J.) (concluding that "a trier of fact

might see" defendants' invocation of an unwritten procedural justification for an affirmative action plan "as nothing but a smokescreen for discrimination"). That is why we have trials.

Defendants argue that we are empowered to resolve this fact dispute in their favor based on Bergenfield's alleged "history of promoting Caucasian candidates to high-level positions," certain "Consent Decrees" discussed below, and the Department's "Recruitment/Equal Employment Opportunity" Policy. Br. 5-6, 26. Not so.

Defendants cite no evidence demonstrating that they were aware of the historical employment decisions referenced by their counsel, many of which did not involve the Department. "[A] fact finder could also conclude that [Defendants] tried to manipulate the process to hire [Rabboh] because [they] had already hired many White supervisors." *Iadimarco*, 190 F.3d at 165. In any event, to "employ racial classifications to cure racial imbalances," a government must demonstrate that the imbalances resulted from "prior *intentional* discrimination." *Lomack*, 463 F.3d at 307 (emphasis added). Defendants do not suggest—much less substantiate—intentional discrimination in the history they invoke. As a consequence of each of these things, Defendants' historical justification did not merit summary judgment.

The record reveals next to nothing about the Consent Decrees that Defendants have invoked. The documents are not in the appellate record, but we take judicial notice of public filings in *NAACP v. Bergenfield*, No. 99 Civ. 5837 (D.N.J.), which is the case that gave rise to the Decrees in question. The NAACP initiated the case in 1999 based on allegations of discrimination against black people, which Bergenfield never conceded and the NAACP was never required to prove. *See*

*id.* ECF No. 3. The first Consent Decree was entered in 2000, and Bergenfield moved to terminate it in 2018 based on "substantial compliance." *Id.* ¶ 19; *id.* ECF No. 5-1 at 4. In lieu of termination, the NAACP and Bergenfield entered into a second Consent Decree in February 2019. *See id.* ECF No. 24. The second Decree required Bergenfield to conduct "targeted advertising" for each civil service examination for a position, "with a focus on African-American segments" of Bergenfield and Englewood, New Jersey. *Id.* ¶ 2. Defendants have not explained how this litigation and the resulting Consent Decrees were relevant to Rabboh's promotion. *Cf. Lomack*, 463 F.3d at 310 ("Compliance with a consent decree may certainly be a compelling interest . . . but only if the decree *mandates* the race-based policy at issue."). Nor do Defendants cite to any evidence supporting their suggestion that they relied upon these Consent Decrees during the selection process. We see nothing in the record to cure either defect.

Defendants' invocation of the Department's "Recruitment/Equal Employment Opportunity" Policy is equally unavailing. JA 352. "[W]hile a valid affirmative action plan is considered nondiscriminatory . . . an *invalid* affirmative action plan is discriminatory." *Shea v. Kerry*, 796 F.3d 42, 57 (D.C. Cir. 2015) (citing *Taxman*, 91 F.3d at 1567). A valid affirmative action plan must "contain as its premise a finding of racial imbalance and express the basis for that finding, set forth a goal for remediating the imbalance, and prescribe some form of standards by which the goal will be achieved." *Klawitter v. City of Trenton*, 928 A.2d 900, 915 (N.J. App. Div. 2007). These "basic ingredients" are missing from the version of Bergenfield's Policy that is included in the record before us. *Id.*; *see also Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 497-98 (3d Cir. 1999). Thus, the record

does not sustain Defendants' position that the Policy was part of a race-neutral justification for Rabboh's promotion.

The relevance of the Policy is subject to additional disputed factual questions. There is some force to Plaintiff's contention that the Policy, on its face, did not apply to the promotion he sought. The Mayor believed the Policy applied to hiring rather than promotions. There are several specific references in the Policy to the position of "Police Officer," but not to the Chief job. JA 352. Perhaps the Policy's general references to "employment policies, practices and procedures" and "selection of candidates" are broad enough to include filling the Department's Chief position. JA 355-56. We could only guess, however, because Defendants point to no evidence in the record regarding the Policy's scope or application. Nor do Defendants cite evidence indicating that they were guided by the Policy in selecting Rabboh. Suffice it to say at this point that the Policy does not bolster Defendants' position in this appeal.

\*       \*       \*

Defendants offered a "bagful" of justifications for the promotion decision. *Fuentes*, 32 F.3d at 764 n.7. Their bag is subject to numerous "weaknesses, implausibilities, inconsistencies, incoherencies, [and] contradictions in the employer's proffered legitimate reasons." *Id.* at 765. For each type of justification, Plaintiff pointed to evidence that would permit a factfinder to "reasonably . . . disbelieve the employer's articulated legitimate reasons." *Id.* at 764-65; *see also Zive*, 867 A.2d at 1144-46. Therefore, Plaintiff met his burden of establishing pretext.

**3.**

Like federal law, New Jersey law provides a second option for a plaintiff to make a pre-trial showing of pretext, which overlaps significantly with the ultimate burden in a discrimination case. *See Zive*, 867 A.2d at 1144-45; *see also Willis v. UPMC Child.'s Hosp. of Pittsburgh*, 808 F.3d 638, 645 (3d Cir. 2015). Specifically, the plaintiff must provide evidence to support a reasonable inference "that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Zive*, 867 A.2d at 1144. Then, "at trial the plaintiff must convince the factfinder that not only was the employer's proffered reason false, but the real reason was impermissible discrimination." *Willis*, 808 F.3d at 645; *see also Viscik v. Fowler Equip. Co.*, 800 A.2d 826, 833-34 (N.J. 2002).

Defendants' concession that they "considered Rabboh's race and religion" accomplished much on Plaintiff's behalf in opposing the summary judgment motion. JA 79. Defendants' follow-up assertion that "race and religion were not the only factors" that they considered is beside the point. JA 90. At summary judgment, Plaintiff was not required to establish that protected characteristics were "the sole or exclusive consideration" in the promotion decision. *Meade v. Twp. of Livingston*, 265 A.3d 148, 160 (N.J. 2021). The question was whether there was enough evidence to support a reasonable inference that race or religion "made a difference." *Id.*

There was more than enough. The record contains both direct and circumstantial evidence of discrimination, including, as examples, the following deposition testimony:

- Less than three months prior to the promotion decision, Defendant Rivera told Plaintiff, in Rabboh's presence, that Plaintiff did not "look like the people in the town." JA 460.

- After participating in the interviews and observing the voting, the Borough Administrator told Plaintiff that the Council's promotion decision was "all about race." JA 475.

- Part of the reason that Defendant Deauna preferred Rabboh was that "he's a minority." JA 611.

- Defendant Marte was asked during his deposition if he "believe[d] it's important to have a minority department head." JA 601. He responded, "considering the demographic of the town, yes, it is important." JA 601.

- The Borough Administrator told Plaintiff that "Rabboh was promoted because he would have been the first Arab/Muslim chief of police in Bergen County." JA 700-01.

- The Borough Administrator told Plaintiff that the Council "screwed over" Plaintiff by promoting Rabboh. JA 704.

- Councilman Lodato was "upset" about the promotion decision and told the Council that it was "definitely going to cause a lawsuit." JA 693-94.

A factfinder could reasonably infer from this evidence, as well as the evidence described above supporting the *prima facie* case, that race and religion made a difference in Defendants'

decision to promote Rabboh.  Therefore, Defendants were not entitled to summary judgment on Plaintiff's NJLAD claim.

## IV.

Plaintiff is also entitled to a trial on his § 1983 claim alleging a violation of the Equal Protection Clause.

Section 1983 provides a mechanism for private actions to vindicate constitutional rights in employment settings.  *See, e.g.*, *Starnes v. Butler Cnty. Ct. of Common Pleas, 50th Jud. Dist.*, 971 F.3d 416, 426-27 (3d Cir. 2020); *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1078-79 (3d Cir. 1990).  *Williams v. Pennsylvania Hum. Relations Comm'n*, 870 F.3d 294 (3d Cir. 2017) is not to the contrary.  In *Williams*, the § 1983 claim was "based on violations" of Title VII and the Americans With Disabilities Act rather than the Constitution.  *See id.* at 296.  We characterized that plaintiff's allegations as involving "pure" statutory theories, and we declined to allow the plaintiff to circumvent the "carefully crafted" procedural requirements associated with those statutes by relying on the express cause of action set forth in § 1983.  *Id.* at 298-99.  We also noted, however, that there was a "strong argument that plaintiffs may advance an employment discrimination claim under § 1983 based on an Equal Protection Clause violation . . . ."  *Id.* at 300 n.34.  That is how Plaintiff structured his § 1983 claim, and his theory is legally sound.

Similar to the NJLAD claim, the parties do not dispute on appeal that *McDonnell Douglas* applies to the § 1983 claim.  For the reasons set forth above with respect to Plaintiff's NJLAD claim, we reject Defendants' evidentiary argument that they were entitled to summary judgment on Plaintiff's

§ 1983 claim. Therefore, we will reverse the judgment disposing of this cause of action.

## V.

Plaintiff's § 1981 claim was defective. He does not dispute that conclusion with respect to the individual Defendants, but he contends on appeal that he was entitled to proceed on a *Monell* theory against Bergenfield under § 1981. He is wrong.

Section 1983 "provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989). In *Jett*, the U.S. Supreme Court rejected a § 1981 damages claim against a municipality that was based on a *respondeat superior* theory. *Id.* at 735-36. The *Jett* Court left open the possibility of a § 1983 claim against a municipality predicated on a statutory right established in § 1981, but only if the claim was based on the theory articulated in *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). *See Jett*, 491 U.S. at 736. We acknowledged this possibility in *McGovern v. City of Philadelphia*, 554 F.3d 114, 121 (3d Cir. 2009). To spell it out: A *Monell* theory against a municipality "arising under § 1981," *id.*, is a § 1983 claim relying on a *Monell* theory predicated on a violation of one of the rights established in § 1981. Plaintiff's § 1981 claim is structured differently, and fatally so. Therefore, we will affirm this aspect of the District Court's ruling.

## VI.

For the foregoing reasons, we will reverse the judgment of the District Court as to Plaintiff's NJLAD and § 1983 claims, affirm as to the § 1981 claim, and remand for proceedings consistent with this opinion.

*Counsel for Appellant*
Dylan T. Hastings          [Argued]
Williams Cedar

*Counsel for Appellees*
John L. Shahdanian, II     [Argued]
Zachary S. Poreman
Trenk Isabel Siddiqi & Shahdanian

*Massey v. Borough of Bergenfield, et al.*, No. 24-2761
BOVE, *Circuit Judge*, concurring.

I write to point out an additional reason that the New Jersey leg of courts' "problematic detour" with the Background Circumstances Rule should end. *Iadimarco v. Runyon*, 190 F.3d 151, 162 (3d Cir. 1999).[1]  The Rule is a discriminatory application of New Jersey's facially neutral Law Against Discrimination (NJLAD).   Thus, the Rule "plainly" violates the Equal Protection Clause.  *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 314 n.1 (2025) (Thomas, J., concurring).

## I.

The "central mandate" of the Equal Protection Clause is "racial neutrality in governmental decisionmaking." *Miller v. Johnson*, 515 U.S. 900, 904 (1995).  The Clause "'cannot mean one thing when applied to one individual and something else when applied to another.'"   *Ames*, 605 U.S. at 314 n.1 (Thomas, J., concurring) (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* (*Harvard*), 600 U.S. 181, 206 (2023)).  "One of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Rice v. Cayetano*, 528 U.S. 495, 517 (2000).  This logic holds firm even where the rule at issue was established "for a 'beneficial' or 'laudable' purpose." *Pryor v. NCAA*, 288

---

[1] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, alterations, and subsequent history.

F.3d 548, 567 (3d Cir. 2002).  The Constitution requires "[m]ore than good motives." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 226 (1995).

Faithful adherence to these principles leaves no doubt that New Jersey's Background Circumstances Rule operates in a racially discriminatory manner.  The judge-made Rule takes a "facially neutral law" and applies it to litigants "differently on the basis of race." *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 543 (3d Cir. 2011) (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)); *Jewish Home of E. Pa. v. Ctrs. for Medicare & Medicaid Servs.*, 693 F.3d 359, 363 (3d Cir. 2012) ("Selective discriminatory enforcement of a facially valid law is unconstitutional under the Equal Protection Clause . . . .").  As such, the Rule "embod[ies] stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government by history and the Constitution." *Miller*, 515 U.S. at 912.

"[G]overnment-sponsored racial discrimination based on benign prejudice is just as noxious as discrimination inspired by malicious prejudice." *Adarand Constructors*, 515 U.S. at 241 (Thomas, J., concurring in part and concurring in the judgment).  New Jersey's pursuit of "a particular course of action '*because of*' its desire to benefit a particular racial group" reflects discriminatory intent. *Antonelli v. New Jersey*, 419 F.3d 267, 274 (3d Cir. 2005) (emphasis added).  Under the Background Circumstances Rule, the NJLAD provides expansive protection to "persons usually discriminated against in the work place," but less protection to other individuals *because of* their membership in a so-called "generally favored group." *Erickson v. Marsh & McLennan Co.*, 569 A.2d 793, 799 (N.J. 1990).  The New Jersey courts have been clear that

the Rule imposes a "heightened" and "heavy" burden on certain NJLAD plaintiffs *because of* their so-called "majority" status. *Bergen Com. Bank v. Sisler*, 723 A.2d 944, 959-60 (N.J. 1999); *see also Cappella v. City of Atl. City*, 2014 WL 1281516, at *12 (N.J. App. Div. 2014) (although white plaintiff "may have established a *prima facie* case of retaliation" he failed to meet his "heavy" burden because he "offered no background circumstances" evidence).

"[W]ell-intentioned or not, express or neutral on its face, a law or policy that purposefully discriminates on account of race is presumptively invalid and can survive only if it withstands strict scrutiny review." *Pryor*, 288 F.3d at 566; *see also Pemberthy v. Beyer*, 19 F.3d 857, 871 n.19 (3d Cir. 1994) ("[A]ll racial classifications require strict scrutiny regardless of whether they favor or disfavor the members of any particular group."). Under that standard, judicial "acceptance of race-based state action has been rare" because "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Harvard*, 600 U.S. at 208.

The Background Circumstances Rule's discrimination lacks an "extraordinary justification." *Doe*, 665 F.3d at 545. The NJLAD all but confirms that such a justification does not exist. In addition to the categorical prohibition on discrimination against "any" person, the text of the NJLAD includes a legislative finding that "discrimination against *any* of [New Jersey's] inhabitants . . . menaces the institutions and foundation of a free democratic State." N.J. Stat. Ann. §§ 10:5-3, 10:5-12(a) (emphasis added). It is difficult to conceive of an unstated justification for "menacing" New

Jersey's "institutions and foundation" by applying the NJLAD in a discriminatory manner based on the Rule.

When given an opportunity at argument to proffer a justification for the Background Circumstances Rule, similar to the attorneys for Ohio in *Ames*, Defendants' counsel offered no valid "justification for imposing a heightened evidentiary standard on majority-group plaintiffs." 605 U.S. at 311. Generalized concerns about societal discrimination are not enough. *See Thompson v. Henderson*, 143 S. Ct. 2412, 2413-14 (2023) (Alito, J., respecting the denial of certiorari) (citing *Harvard*, 600 U.S. at 207); *Adarand Constructors*, 515 U.S. at 239 (Scalia, J., concurring in part and concurring in the judgment) ("In my view, government can never have a 'compelling interest' in discriminating on the basis of race in order to 'make up' for past racial discrimination in the opposite direction."). That is particularly true where, as here, expressed concerns about past societal discrimination are divorced from a finding that a New Jersey institution is culpable in that conduct. *See Lomack v. City of Newark*, 463 F.3d 303, 307 (3d Cir. 2006) ("[R]ace-based preferences cannot be justified by reference to past 'societal' discrimination in which the municipality played no material role."). The Constitution does not permit enforcement of "shifting preferences based on inherently unmeasurable claims of past wrongs." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 506 (1989).

Even if there was an interest sufficient to warrant the racial discrimination at issue, the Background Circumstances Rule is not "'narrowly tailored'—meaning 'necessary'—to achieve that interest." *Harvard*, 600 U.S. at 207. From inception, the Rule was a crude measure. Like other courts, the Supreme Court of New Jersey was trying to address the fact that *McDonnell Douglas* made status in a "protected class" an

element of a *prima facie* discrimination claim. *See Erickson*, 569 A.2d at 799. In response, New Jersey joined the effort by other federal courts to "'cram' the 'reverse discrimination' cases into the *McDonnell Douglas* framework." *Iadimarco*, 190 F.3d at 158. The resulting approach was improperly "literal," *id.*, and unnecessarily "inflexible," *Ames*, 605 U.S. at 311. This Court explained more than 25 years ago that there is a simpler, race-neutral alternative for applying the NJLAD in this setting. *See Iadimarco*, 190 F.3d at 161 ("[A]ll that should be required to establish a *prima facie* case in the context of 'reverse discrimination' is for the plaintiff to present sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII."). The Supreme Court of New Jersey observed at the start of all this that caselaw applying *McDonnell Douglas* "must be modified where appropriate." *Erickson*, 569 A.2d at 799. Nevertheless, the court chose not to modify the *McDonnell Douglas prima facie* case, and "there does not appear to have been any consideration" of the type of option we subsequently adopted in *Iadimarco*. *Croson*, 488 U.S. at 507.

An additional tailoring defect arises from the fact that the racial and other categories necessary to draw the discriminatory lines contemplated by the Background Circumstances Rule "tend to be overbroad and imprecise in many ways." *Ames*, 605 U.S. at 316 (Thomas, J., concurring). The Rule's application turns on the concept of a "majority," but offers no guidance on the appropriate geographic boundaries for doing that math. On this issue, Defendants' counsel claimed at argument—implausibly—that the appropriate geographic unit for defining the "majority" when applying the Rule was not Bergenfield, or Bergen County, or

even "the limited window of the State of New Jersey." Oral Argument Audio at 20:40. "We have never approved the extrapolation of discrimination in one jurisdiction from the experience of another." *Croson*, 488 U.S. at 505.

The Background Circumstances Rule also relies on assumptions about an "unusual employer" that are counter to reality and therefore unnecessary for purposes of strict-scrutiny tailoring analysis. *See Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 302 n.6 (3d Cir. 2004) ("[I]t may not be so unusual for employers to discriminate against the majority . . . ."); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."). This is illustrated by the fact that, in *Harvard*, "self-proclaimed 'Major American Business Enterprises' filed a vehement amicus brief" advocating for the form of discrimination that the Court ultimately prohibited. *Smyer v. Kroger Ltd. P'ship I*, 2024 WL 1007116, at *7 (6th Cir. 2024) (Boggs, J., concurring); *see also Preston v. Wis. Health Fund*, 397 F.3d 539, 542 (7th Cir. 2005) (explaining that "situations have been identified" where companies "are under pressure from affirmative action plans"). The fact that the "unusual employer" premise no longer holds is another reason why the Rule is not necessary in the strict-scrutiny sense.

\*     \*     \*

In plain terms: "racial discrimination is nearly always irrational." *Pryor*, 288 F.3d at 566. This criticism strikes a fierce blow to the Background Circumstances Rule. The Rule

cannot survive strict scrutiny because it is unjustified and untailored.  So the Rule violates the Equal Protection Clause.

## II.

Our panel opinion applies binding precedents strewn along a winding road of judge-made rules starting with *Erie*, which some have said was "obviously, laughably, friendlessly wrong."  *Stanford ex rel. Phillips v. Brandon Nursing & Rehab. Ctr., LLC* (*Stanford*), 160 F.4th 118, 129 (5th Cir. 2025) (Oldham, J., dissenting).  An *Erie* prediction was the appropriate course under our precedent, and it was unnecessary to certify the question to New Jersey, because the NJLAD's text is not "unclear."  *United States v. Defreitas*, 29 F.4th 135, 141 (3d Cir. 2022).  We were required to perform a bit of a hybrid analysis, however, because New Jersey courts have spent more than 45 years looking to *McDonnell Douglas* and related federal caselaw when applying the NJLAD.  *See, e.g.*, *Peper v. Princeton Univ. Bd. of Trs.*, 389 A.2d 465, 479 (N.J. 1978).  That challenged the application of "*Erie*'s deeply ahistorical premise that federal judges are custodians of federal law, while state judges are custodians of state law—and never the twain shall meet."  *Stanford*, 160 F.4th at 133 (Oldham, J., dissenting).

The twain met here.  The custodial duties overlapped.  The District Court was required to apply state law interpreting a federal test, *McDonnell Douglas*, that is not without flaws.  "[T]he tide runs against *McDonnell Douglas* as strongly as it does for a good reason for the test has proven of limited value even in its native waters," often inviting "confusion and complexities."  *Walton v. Powell*, 821 F.3d 1204, 1210 (10th Cir. 2016) (Gorsuch, J.).  This "confusion arises" in an acute manner when "attempting to apply the *McDonnell Douglas*

burden-shifting framework" in "reverse discrimination" cases. *Iadimarco*, 190 F.3d at 158.  Here, the challenges the District Court was forced to grapple with also include the fact that the "intermediate evidentiary burdens" of *McDonnell Douglas* isolate evidence into unnatural buckets that are difficult to differentiate and in tension with the text of Rule 56.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  This can have the unintended effect of obscuring the "ultimate question": the existence, or not, of material factual disputes regarding whether "the defendant intentionally discriminated against the plaintiff."  *Id.*; *see also Ismael v. Roundtree*, 2025 WL 3492930, at *6 (11th Cir. 2025) ("[F]ocusing on the defendant's justification can lead both litigants and the court down a rabbit hole that obfuscates the plaintiff's affirmative claim.").

The Equal Protection Clause cuts through the vortex of binding judicial contrivances—*Erie*, *McDonnell Douglas*, and the Background Circumstances Rule—that swirled around this appeal.  *See Hollis v. Morgan State Univ.*, 153 F.4th 369, 387-88 (4th Cir. 2025) (Quattlebaum, J., concurring) ("When someone says, 'watch this, hold my beer,' what follows rarely turns out well.  The same is true when judges make up tests inconsistent with the statutory text that Congress enacted.").  While our prediction about how the Supreme Court of New Jersey would apply *Ames* to the NJLAD is based exclusively on the considerations set forth in the panel opinion, I do not believe the Constitution permits any other conclusion.